# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL EXPERIENTIAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-810 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, MB REAL ESTATE | ) | |
| SERVICES, INC., CHICAGO | ) | |
| CONVENTION AND TOURISM | ) | |
| BUREAU, INC. d/b/a CHICAGO SPORTS | ) | |
| COMMISSION, and KARA BACHMAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In 2020, the City of Chicago hosted the NBA All-Star Game. The festivities attracted a lot of attention, and a lot of business. Plaintiff National Experiential, a marketing and advertising agency, planned to add to the atmosphere by projecting a Nike light show onto two large skyscrapers. The display would feature a video of the classic dunk by Michael Jordan during the 1988 slam-dunk contest, plus the Nike "Jumpman" logo.

National Experiential signed a contract with the City, giving National Experiential a license to project images from Millennium Park. But the License Agreement included a number of important caveats. The contract required National Experiential to get all necessary permits. And it gave the City the express contractual right to cancel at any time, for any reason.

Two days before the display, National Experiential received an email from MB Real Estate Services, the manager of Millennium Park. MB declared that the project was "not approved" because National Experiential didn't have the necessary permits. That declaration led

to a mad scramble by National Experiential, who tried to convince the City to let the plan go forward.

On the day of the display, National Experiential kept at it, trying to persuade the City that the display was art (without a commercial message). It didn't work. Out of the blue, National Experiential received an email from a representative of the Chicago Sports Convention – a private actor – declaring that the anticipated display was not approved. At that point, the City formally pulled the plug on the light show.

Without approval from the City, Nike told National Experiential that the light show was a no-go. But when night fell, the buildings were not dark. All along, the Chicago Sports Commission had wanted one of the skyscrapers to be illuminated in red, the color of the Chicago Bulls. And in the end, the Chicago Sports Commission got what it wanted.

National Experiential responded by filing suit against the City, the Chicago Sports Commission, its director (Kara Bachman), and MB Real Estate Services (the manager of Millennium Park). National Experiential advanced six claims, including free speech claims as well as claims alleging breach of contract and tortious interference with contract.

Defendants filed motions to dismiss. For the reasons stated below, the motions to dismiss are granted. But the Court grants Plaintiff leave to amend.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

## I. The Project

National Experiential is an advertising and marketing agency. *See* Cplt., at ¶ 8 (Dckt. No. 1). It draws attention to its clients and heightens brand awareness through laser projections, custom digital installations, and street level displays. *Id.*

In December 2019, National Experiential landed a contract with MacDonald Media[1] to provide light projections in Chicago during the NBA's 2020 All-Star weekend. *Id.* at ¶ 9. Under that contract, National Experiential agreed to arrange and perform video projections on the Prudential Building and the Aon Center on the nights of February 14 and 15, 2020. *Id.*

For out-of-towners, the Prudential Building and the Aon Center are large skyscrapers on the north end of Millennium Park in downtown Chicago. They are prominent fixtures in Chicago because they tower over the north end of green, wide-open space consisting of Millennium Park and (to the south) Grant Park. They're especially visible from Lake Shore Drive and from Michigan Avenue, and they're sometimes illuminated for special events. The Prudential Building is a wider, shorter building, and the Aon Center is a narrower, taller building (one of the tallest in Chicago) to the east of the Prudential Building (*i.e.*, closer to Lake Michigan).

The light show was supposed to project Nike imagery. An artistic rendering of the anticipated display – including pictures and link to the video of the proposed light show – is in the record. *See* Def. City of Chicago's Mtn. to Dismiss, at 5 (Dckt. No. 34). On the Prudential Building, the display would include a video of Michael Jordan's iconic, gravity-defying dunk – after jumping from the free throw line – during the slam-dunk contest at the 1988 All-Star Game.

---

[1] The complaint refers to both MacDonald Media and McDonald Media. *See* Cplt., at ¶¶ 9, 10, 60, 65, 71, 72, 73, 76, 77, 78, 80, 81 (Dckt. No. 1). They are presumably the same company. The Court is not certain which spelling is correct, but National Experiential first stated that it contracted with MacDonald Media, LLC. *Id.* at ¶ 9. So, the Court chooses to go with the MacDonald spelling.

On the Aon Center, the display would feature the Nike "Jumpman" logo. *Id.*; Pl.'s Resp. to Defs.' Mtns. to Dismiss, at 5 (Dckt. No. 44).

National Experiential's plan was to project the light show from Millennium Park (public property) onto the Prudential Building and the Aon Center (private property). The projection equipment would be in the park, and cast the images onto the buildings.

As one can imagine, that type of project comes with a lot of logistics. So National Experiential got to work. It contacted the City of Chicago Department of Cultural Affairs and Special Events ("DCASE"). It reached out to the operators of the Prudential Building and the Aon Center. And it touched base with MB Real Estate Services ("MB"), which manages Millennium Park. *See* Cplt., at ¶ 10 (Dckt. No. 1).

On December 10, National Experiential received an email from Jonathan Scott, MB's Private Events Manager. *Id.* Scott provided an estimate for the cost of using space in the park for the equipment. *Id.*

And most importantly, Scott addressed whether National Experiential needed to jump through any hoops with the City. Scott wrote that he had "checked with the city and they feel as long as you have permission from the buildings, there shouldn't be a Special Event Permit Application needed but we will need to loop in the Mayor's Office, 1st District and 42nd Ward for awareness." *Id.* Scott said that he would send a letter with the details of the project to the City "so no surprises pop up." *Id.*

On January 28, 2020, a little more than two weeks before the big game, National Experiential emailed Scott and proposed a meeting to go over the details. *Id.* at ¶ 11. Scott, in turn, responded that he needed a letter with the "description, dates and times of what you are

producing," as well as "approvals from Prudential and AON." *Id.* He promised to send that letter to the City "so no surprises pop up." *Id.*

In the ensuing back-and-forth by email, National Experiential gave more information about the project, and Scott requested more information, too. *Id.* at ¶ 12. Scott asked for "a couple of paragraphs describing what you are actually doing / projecting on the two buildings, the dates and times the light show will be occurring." *Id.* Scott said that he would "send this on to the city for approval." *Id.*

On January 29, National Experiential sent Scott a letter with a description of the proposed project, including "links to videos of the projections that would be used." *Id.* at ¶ 14. Scott, in turn, sent that information to the City. *Id.*

MB gave National Experiential an update on February 3, less than two weeks before the anticipated light show. MB shared that it had "just spoke[n] to the City of Chicago to make sure that the Alderman and DCASE are aware that Nike's Light Promo for the NBA is taking place." *Id.* at ¶ 15. He asked for written confirmation that the Prudential Building and the Aon Center had signed off on the project. National Experiential promptly sent MB a copy of the written approval from the two buildings. *Id.* at ¶¶ 16, 18.

## II.    The Contract

A few days later, National Experiential signed the License Agreement with the City for the proposed light show. *Id.* at ¶ 17; *see also* License Agreement (Dckt. No. 34-1, at 4 of 17). The City granted National Experiential a license "to use the spaces in Millennium Park designated in Paragraph 2 during the periods set forth herein [*i.e.*, February 14–15, 2020] for the following performance/event and for no other purpose: **Nike Light Promo for NBA All-Star**

**Game**." *See* License Agreement, at ¶ 1 (emphasis in original). The contract required National Experiential to pay an event fee of $105,495. *Id.* at ¶ 4.

The contract did not say that National Experiential did not need a permit. And the contract did not purport to *grant* a permit, either. Quite the opposite. The License Agreement called attention to the fact that National Experiential might need a permit, if local ordinances required a permit for this particular project.

Specifically, paragraph eight of the License Agreement incorporated by reference the terms of the "General Conditions," meaning the exhibit attached to the contract. *Id.* at ¶ 8. And paragraph eleven of the General Conditions flagged the possible need for a permit: "Licensee shall obtain and pay for all necessary permits and licenses, if any, required for the entertainment or activity being presented . . . ." *See* General Conditions, at ¶ 11 (Dckt. No. 34-1, at 8 of 17).

The License Agreement also gave the City wide latitude to cancel the contract in its entirety. "This license agreement is revocable and may be terminated by the City at any time and for any reason." *See* License Agreement, at ¶ 8 (Dckt. No. 34-1, at 5 of 17).

National Experiential signed the contract on February 5, and the City signed it on February 7. *See* License Agreement, at 3 (Dckt. No. 34-1, at 6 of 17); Cplt., at ¶¶ 17, 20 (Dckt. No. 1). On February 7, National Experiential reached out to MB for written confirmation that it had permission to use the space in Millennium Park. *See* Cplt., at ¶ 19. MB responded: "the contract will suffice . . . ." *Id.*

For a while, things seemed to go according to plan. On the night of February 7, MB sent an email (presumably to National Experiential, but the complaint does not specify) confirming that "National Experiential has permission to utilize Millennium Park to house projection tents and projectors for an activation related to the NBA 2020 All-Star game . . . ." *Id.* at ¶ 21.

With the contract in hand, National Experiential got things rolling. It paid for the space, and started setting up. On February 8, National Experiential paid the City $116,044.50, representing the use fee and a deposit (for cleanup, presumably). *Id.* at ¶ 22. It also paid $325,000 to the owners of the Aon and Prudential buildings. *Id.* at ¶ 24. On February 10, National Experiential began to build the structures and set up the equipment in Millennium Park. *Id.* at ¶ 23.

### III.    The Termination

Everything seemed to be going according to plan until February 12, 2020, only two days before the anticipated display. All of a sudden, Micah Lane of MB sent National Experiential an email that put an end to the project. The email stated that "the activation [of the Millennium Park Project] will not be moving forward and all activity related to this activation should cease immediately to mitigate costs for all involved." *Id.* at ¶ 25.

The reason involved permits. MB explained that the light show was "not approved by appropriate City of Chicago municipal departments" because "permits were needed." *Id.* at ¶ 26. That revelation, it seems, was news to National Experiential. According to the complaint, National Experiential was "told by the City in December 2019 that no permit was needed." *Id.*; *see also id.* at ¶ 40.

National Experiential scrambled for the next few days, trying to get the City to change course and change its mind. The City, in turn, pointed to a local ordinance that requires a permit for certain signs, and prohibits certain signs altogether.

Specifically, section 17-12-0804-E of the Chicago Zoning Ordinance provides: "[t]he Zoning Administrator is authorized to issue temporary sign permits for special event signs and to impose time limits and other restrictions on the use, location, dimensions and characteristics of

such signs to ensure that they are consistent with the purposes of this chapter." *See* MCC § 17-12-00804-E; *see also* MCC § 17-12-0100 (describing the wide-ranging "purposes of this chapter").

The ordinance bans temporary illuminated signs, and dynamic image displays. *See* MCC § 17-12-0804-A ("*Temporary signs* may not be illuminated. *Changing-image sign* features and electronic elements are prohibited.") (emphasis in original); *see also* MCC § 17-17-02176 (defining a "temporary sign"). But the ordinance exempts works of art that have no commercial message. *See* MCC § 17-12-0500 ("The following are exempt from regulation under this Zoning Ordinance and do not require *sign* permits . . . Works of art with no *commercial message*.") (emphasis in original); *see also* MCC § 17-17-0236 (defining the term "commercial message" as "[a]ny *sign*, wording, logo or other representation that, directly or indirectly, names, advertises or calls attention to a business, product, service or other commercial activity") (emphasis in original).

That City ordinance posed a potentially big problem for National Experiential. It wanted to display illuminated, changing-image projections. It wanted to promote the business and the brand of Nike. And it didn't have a permit.

National Experiential tried to convince the City that the projections were artistic and not subject to the zoning ordinance. *See* Cplt., at ¶ 27 (Dckt. No. 1). The City didn't buy it. *Id.* On February 14 – the day that the lights were supposed to turn on – the City's Zoning Administrator (Patrick Murphey) told National Experiential that "this has evolved into a much larger issue that appears to go well beyond zoning." *Id.* Late that afternoon, Nike forwarded materials to the City arguing that the projections were artistic expression, and not commercial expression. *Id.*

Only 10 minutes later, National Experiential received an email from Kara Bachman, the Executive Director of the Chicago Sports Commission (the "CSC"), which is the trade name of the Chicago Convention and Tourism Bureau. *Id.* at ¶¶ 6, 28. The CSC is "composed of an array of Chicago's most powerful business and sport leaders," including representatives of the Chicago Bulls. *Id.* at ¶¶ 29, 32.

Bachman declared that the project was a no-go, and she didn't pull any punches. She wrote: "You do not have approval to project. It's simple. NOT APPROVED." *Id.*

That thunderbolt seems to have taken National Experiential by surprise. The email seemingly came out of the blue. Bachman hadn't been actively involved in any aspect of the project up to that point. *Id.*

And, strictly speaking, the CSC doesn't have the power to approve or disapprove anything on behalf of the City. The CSC is a private business league. It is not an agency, department, or division of the City of Chicago. *Id.* at ¶ 29. The CSC may have clout with the City, but it isn't *the City*. And Bachman, in particular, is a private individual and is not employed by the City. *Id.* at ¶ 30.

National Experiential offers an explanation for why, exactly, the CSC suddenly emerged. Bachman and the CSC had their own ideas about what should be projected during the All-Star Game. In December 2019, the CSC had asked the Prudential Building to light the building red – the color of the Chicago Bulls – during the weekend of the All-Star game. *Id.* at ¶¶ 31–32.

The CSC, it seems, was none-too-happy that the City had entered into a contract with National Experiential. So the CSC "exerted pressure behind the scenes with MB and City officials to prevent the performance of the Millennium Park Project beginning at least as early as

February 12, 2020." *Id.* at ¶ 32. So CSC operated "behind the scenes" until it burst onto the scene and shouted that the illumination project was "NOT APPROVED." *Id.* at ¶¶ 28, 32.

The CSC may not be the City. But it didn't take long for the City to follow suit. On February 14 – the same day that Bachman sent her email, and the day of the display – the City formally announced that it was cancelling the License Agreement. *Id.* at ¶ 33.

Without approval from the City, Nike and National Experiential relented. *Id.* at ¶¶ 34–35. So Michael Jordan and the Nike logo didn't grace the Prudential Building and the Aon Center after all.

But the Prudential Building wasn't dark. It was red. Just like the CSC wanted. "[T]he CSC arranged to have the Prudential Building illuminated in the Chicago Bull's [sic] red during the NBA's All-Star game weekend, and it was so illuminated." *Id.* at ¶ 36.

## IV. The Lawsuit

National Experiential responded by filing this lawsuit against the City of Chicago, MB, the CSC, and Bachman. *See* Cplt. (Dckt. No. 1). National Experiential brings six claims. Two claims are about the First Amendment. Three claims are about the contract. The last claim is about a conspiracy.

Count I alleges that the Defendants violated National Experiential's right to free speech under the First Amendment by labeling the projection a temporary sign requiring a permit, while permitting the CSC's projection without a permit. *Id.* at ¶¶ 38–50.

Count II alleges that the City of Chicago's zoning ordinance unconstitutionally restricts commercial speech without a compelling interest. *Id.* at ¶¶ 51–56.

Count III alleges that the City of Chicago breached its contract with National Experiential. *Id.* at ¶¶ 57–65.

10

Count IV alleges that MB, the CSC, and Bachman tortiously interfered with National Experiential's contract. *Id.* at ¶¶ 66–73.

Count V alleges that the City of Chicago tortiously interfered with National Experiential's contract. *Id.* at ¶¶ 74–78.

And Count VI alleges that the Defendants conspired to tortiously interfere with National Experiential's contract. *Id.* at ¶¶ 79–83.

Defendants later moved to dismiss for failure to state a claim. *See* Defs. CSC and Bachman's Mtn. to Dismiss (Dckt. No. 27); Def. MB's Mtn. to Dismiss (Dckt. No. 30); Def. City of Chicago's Mtn. to Dismiss (Dckt. No. 34).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the

complaint and referred to in it, and information that is subject to proper judicial notice."
*Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## Analysis

### I. First Amendment Claims (Counts I & II)

National Experiential's first two claims involve the First Amendment. But as things currently stand, the allegations of the complaint are too murky and uncertain to state a claim. All too often, it is not entirely clear what, exactly, National Experiential is alleging. So the Court will *sua sponte* convert the motion to dismiss into a motion for a more definite statement, and will give National Experiential a chance to file an amended complaint. *See* Fed. R. Civ. P. 12(e); *see also Mitchell v. Elec. Beach Tanning Salon Ltd.*, 2019 WL 1077127, at *2 (N.D. Ill. 2019) ("[A] court has the discretion to order a more definite statement *sua sponte* with appropriate notice and as needed.") (citing *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)) (other citations omitted).

At first blush, the two claims don't seem complicated. Count I is a free speech claim against all Defendants, and Count II is a free speech claim against the City. Both claims center on the ordinances about temporary signs. But before long, things go off the rails, and it is not clear which direction National Experiential is headed.

The primary ordinance covers permits for temporary signs. "The Zoning Administrator is authorized to issue temporary sign permits for special event signs and to impose time limits and other restrictions on the use, location, dimensions and characteristics of such signs to ensure that they are consistent with the purposes of this chapter." *See* MCC § 17-12-00804-E.

Some temporary signs are categorically out of bounds, and some signs are categorically exempt. Specifically, an ordinance prohibits temporary signs that are illuminated or that have

12

changing images. "*Temporary signs* may not be illuminated. *Changing-image sign* features and electronic elements are prohibited." *See* MCC § 17-12-0804-A (emphasis in original). But another ordinance exempts works of art. "The following are exempt from regulation under this Zoning Ordinance and do not require *sign* permits: . . . Works of art with no *commercial message*." *See* MCC § 17-12-0500 (emphasis in original).

Out of the gate, National Experiential alleges that the City violated its right to free speech by requiring a permit after telling National Experiential (through MB) that it didn't need a permit. "The City also improperly claimed that the Chicago Municipal Code . . . required a zoning permit even after it told Plaintiff that no special event permit application was needed so long as the permission of the building owners was obtained." *See* Cplt., at ¶ 40 (Dckt. No. 1); *see also* Pl.'s Resp. to Defs.' Mtns. to Dismiss (Dckt. No. 44) ("The cancellation of the license two days before the event . . . on the grounds that a permit was required was an abridgement of Plaintiff's right to free speech.").

That bait-and-switch theory sounds like a breach of contract claim, not a free speech claim. National Experiential doesn't offer this Court any authority for the notion that the First Amendment locked-in the City's first reaction about the need for a permit. The First Amendment doesn't prevent the City from changing its mind.

Is National Experiential arguing that the First Amendment prevents the City from requiring permits for speech? Presumably not. If not, why would the First Amendment prevent the City from telling National Experiential at the last minute that it needed a permit? The First Amendment presumably did not put the City on the clock.

From there, the mysteries deepen. The complaint alleges that the "regulations permit commercial speech and do not regulate artistic speech." *See* Cplt., at ¶ 45 (Dckt. No. 1). That

allegation makes it sound like National Experiential is alleging that the City discriminated against commercial speech (like the displays at issue here) by favoring artistic speech. But a few paragraphs later, the complaint alleges that the City "denied Plaintiff's right to free speech when it refused to consider whether Plaintiff had tendered alternate images that were *purely artistic*." *Id.* at ¶ 49 (emphasis added). That allegation sounds like National Experiential is alleging that the City should have classified the displays as art, not commercial speech.

And then, National Experiential seems to allege discrimination, perhaps viewpoint discrimination of some kind. "The City of Chicago improperly discriminated against Plaintiff by labeling its projection a temporary sign that required a permit and in so doing denied Plaintiff's right to free speech but required no permit of the CSC and the Prudential Building when they lit the building in the colors of the privately owned Chicago Bulls after Plaintiff had been barred from projecting images." *Id.* at ¶ 47; *see also id.* at ¶ 50 (alleging that Defendants violated the First Amendment by "acting together to prohibit Plaintiff's speech and favor the speech of the CSC in the ways alleged above").

But there is nothing in National Experiential's response brief about viewpoint discrimination, leaving this Court to guess what, exactly, National Experiential is claiming. Is National Experiential alleging that the City favored one *speaker* over another? That is, is it claiming that the City gave preference to a local group over an out-of-state company (putting aside their views)? How does that work when the situation is zero-sum, meaning that only one speaker can project something on the buildings?

Or, is National Experiential complaining that the City favored certain *speech* over other speech, based on its content? *See, e.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Turner Broad. Sys.*,

14

*Inc. v. FCC*, 512 U.S. 622 (1994); *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789 (1984). That is, does the City like the Chicago Bulls more than it likes selling shoes? Something else?

And looming in the background is the need for a permit. If National Experiential's display was commercial speech – which seems inevitable – then it needed a permit (according to the City). It was a temporary sign, and it was illuminated with moving images. But what about the other display (preferred by the CSC), the color red? Is a color a "sign" within the meaning of the ordinance? *See* MCC § 17-17-02159 (defining "sign" as "[m]aterials placed or constructed, or light projected, that (1) conveys a message or image and (2) is used to inform or attract attention of the public"). And if so, did it need a permit? If not, how does the fact that National Experiential's display required a permit, and the competing proposal (for a red building) did not, affect the analysis, if at all?

National Experiential also includes allegations that the ordinances, as applied, are overbroad, and vested public officials with unbridled discretion. *See* Cplt., at ¶¶ 55–56 (Dckt. No. 1). Overbreadth is a facial challenge, not an as-applied challenge. *See United States v. Williams*, 553 U.S. 285, 292 (2008). And attacking a licensing statute for vesting unbridled discretion in a government official is a facial attack. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 760, 755 (1988). Neither party addresses overbreadth or discretion in their briefs. And it is not clear if National Experiential is making separate overbreadth and discretion claims, or folding those allegations into its challenge to the ordinance.

In Count II, National Experiential seems to challenge the prohibition against temporary signs that are illuminated and have dynamic images. It is not clear if National Experiential is making a facial challenge, or an as-applied challenge, or perhaps both.

15

The complaint alleges that the ordinances "on their face restrict commercial speech in the form of illuminated temporary signs while imposing no such illumination restriction on artistic noncommercial speech, without any compelling interest in the distinction." *See* Cplt., at ¶ 54 (Dckt. No. 1). But National Experiential's brief didn't say anything about a facial challenge. *See* Pl.'s Resp. to Defs.' Mtns. to Dismiss (Dckt. No. 44). Another paragraph of the complaint alleges that the ordinance is "unconstitutional as applied" because the City exempts artistic signs with no commercial message. *See* Cplt., at ¶ 52.

Those allegations raise a number of questions. For starters, one wonders if National Experiential is alleging that the Nike projection was art, not commercial speech. Nike is well-known for top-of-the-line athletic apparel. It sells shoes. It is not known as an artist.

True, Michael Jordan's high-flying dunk undoubtedly showed a high level of artistry, from an athletic perspective. But the notion that Nike was not engaging in commercial speech seems like quite a leap of its own. The display included the Nike "Jumpman" logo, maybe one of the most recognized and valuable commercial marks anywhere in the world.

Sometimes the briefs can sharpen the allegations, allowing a district court to seize hold of a claim and address its merits. But here, the arguments in the briefs are simply too skeletal. National Experiential cites a leading Supreme Court case about commercial speech, but not much else. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980); *see also Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 138 S. Ct. 2448, 2464–65 (2018) (noting that "commercial speech has been thought to enjoy a lesser degree of protection").

In its brief, National Experiential takes the position that its display was commercial speech. *See* Pl.'s Resp. to Defs.' Mtns. to Dismiss, at 1 (Dckt. No. 44) ("The ban on the

commercial speech inherent in the 'Nike Light Promo for the NBA All-Star Game,' a logo known as the 'Jumpman,' . . . was unconstitutional . . . ."). If so, one wonders why the complaint includes the allegations about the exemption for artistic speech. Is National Experiential arguing that the City violated its right to commercial speech by taking a more lenient approach to art?

National Experiential offers no authority for the notion that the City must apply a one-size-fits-all approach to signs. And it does not address the case law about underinclusive restrictions on speech. *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) ("It is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech.") (emphasis in original).

And so on. True, a complaint does not have to pin down its precise legal theory. *See Skinner v. Switzer*, 562 U.S. 521, 530 (2011). But here, there is simply too much wiggle room in the pleading, and the supporting brief added to the wiggle. The uncertainty about what, exactly, National Experiential is alleging inhibits this Court's review of the complaint. The complaint is "so vague or ambiguous that the party" – and the Court – "cannot reasonably prepare a response." *See* Fed. R. Civ. P. 12(e).

For the sake of efficiency, the Court will not guess what National Experiential is claiming. Instead, a better approach is to sharpen the pleadings, pin down the claims, and go from there. The Court dismisses the First Amendment claims (Counts I & II) with leave to amend.

## II. Breach of Contract, and Tortious Interference with Contract (Counts III–V)

The next three claims involve the License Agreement. National Experiential brings a breach of contract claim against the City for cancelling the project. *See* Cplt., at Count III (Dckt. No. 1). National Experiential also brings a tortious interference claim against MB, the CSC, and

Bachman for inducing the City to breach that contract. *Id.* at Count IV. Finally, National Experiential brings a tortious interference claim against the City, claiming that the cancellation of the project "interfered in Plaintiff's contract with McDonald [sic] Media." *Id.* at ¶ 76.

The Court will start with the breach of contract claim, and then will turn to the two tortious interference claims.

National Experiential's claim is relatively simple. National Experiential alleges that the City breached the License Agreement by pulling the plug on the light show. "The City of Chicago breached the contract without justification when it terminated the contract of February 14, 2020." *Id.* at ¶ 64.

Under Illinois law,[2] a breach contract claim includes the following elements: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach by the defendant; and (4) resulting damages to the plaintiff. *See In re Soc'y Ins. Co. v. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 521 F. Supp. 3d 729, 737 (N.D. Ill. 2021) (citing *Pepper Const. Co. v. Palmolive Tower Condos., LLC*, 2016 IL App (1st) 142754, 405 Ill. Dec. 748, 59 N.E.3d 41, 66 (2016)); *ABC Int'l Inc. v. GD Grp. USA Co.*, 2021 WL 4459462 (N.D. Ill. 2021) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill. App. 3d 752, 286 Ill. Dec. 734, 814 N.E.2d 960, 967 (2004)).

The parties focus their attention on the existence of a breach. And in the process, they spill a lot of ink about the need for a permit. Defendants point out that National Experiential needed a permit for this particular display under the City's ordinances. *See, e.g.*, Def. City of Chicago's Mtn. to Dismiss, at 13–14 (Dckt. No. 34). In their view, National Experiential did not

---

[2] The contract includes a choice-of-law provision that invokes Illinois law. *See* General Conditions, at ¶ 42 (Dckt. No. 34-1).

substantially perform because it never got a permit. And the City didn't breach, because the City didn't have to allow the light show if National Experiential didn't have a permit.

National Experiential, in turn, argues that there was no need for a permit, because MB said that it didn't need one. *See* Pl.'s Resp. to Defs.' Mtns. to Dismiss, at 2, 9–10 (Dckt. No. 44). And MB acted on behalf of the City as the manager of Millennium Park.

The breach of contract claim fails for a different, basic reason. The City cancelled the contract. But the License Agreement expressly gave the City the right to cancel the contract. It provided: "This license agreement is revocable and may be terminated by the City at any time and for any reason." *See* License Agreement, at ¶ 12 (Dckt. No. 34-1, at 5 of 17).

Notice the generous sweep of that language. The contract gave National Experiential a license, but it was "revocable." *Id.* The City had the express contractual right to "terminate[]" the contract. *Id.* At "*any* time." *Id.* (emphasis added). For "*any* reason." *Id.* (emphasis added).

The plain language of the License Agreement forecloses a breach of contract claim. National Experiential alleges that the City "breached the contract without justification when it terminated the contract." *See* Cplt., at ¶ 64 (Dckt. No. 1). But the License Agreement gave the City the express contract right to terminate the deal whenever it wanted. *See* License Agreement, at ¶ 12 (Dckt. No. 34-1, at 5 of 17). Canceling the deal "without justification" is not actionable, because the contract said that the City didn't *need* a justification.

So, even if the facts of the complaint are taken as true, National Experiential has no breach of contract claim. Maybe the City did the bidding of the CSC, and ended the deal with National Experiential so that the CSC could get its way and gaze at a bright-red Prudential Building. That's not a breach of contract.

19

Maybe there is more to the story. The License Agreement requires the City to refund money to the licensee if the City cancels the contract. *Id.* The complaint does not address whether the City refunded the money. It doesn't appear to be an issue, because the complaint seeks lost profits, not the recoupment of funds.

And more broadly, maybe there are more facts that shed light on the City's cancellation. For that reason, the Court grants National Experiential leave to file an amended complaint.

The demise of the breach of contract claim (Count III) spells the end for the first tortious interference claim (Count IV), too. Under Illinois law, a tortious interference with contract claim has the following elements: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (citing *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015)); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 137 Ill. Dec. 19, 545 N.E.2d 672, 675–76 (1989).

The complaint alleges that MB, the CSC, and Bachman "intentionally and without justification interfered with the Plaintiff's contract with the City of Chicago in the ways alleged above in order to have the colors of the Chicago Bulls displayed instead of Nike related material." *See* Cplt., at ¶ 69 (Dckt. No. 1). And as a result of their "intentional interference," the City "breached the contract it had with Plaintiff." *Id.* at ¶ 70.

The City didn't breach its contract with National Experiential when it cancelled the contract, because it had the express contractual right to cancel the contract. And without a breach, there is no tortious interference claim. MB, the CSC, and Bachman did not induce a breach by the City when there *was no* breach by the City.

The claim about tortious interference (Count IV) also includes a stray, enigmatic sentence about the contract between Nike and MacDonald Media. "MB, the CSC and Kara Bachman's intentional conduct also led to Nike announcing that it would not perform under the McDonald [sic] Media contract, which was breached as a result." *Id.* at ¶ 71. That sentence, standing alone, doesn't say anything about National Experiential. Plaintiff A presumably can't sue Defendant B for interfering with a contract between Third Party C and Third Party D, without more (such as evidence that Plaintiff A was a third-party beneficiary).

Maybe the theory is that MB, the CSC, and Bachman induced the City to break its contract with National Experiential, which led Nike to end the deal with MacDonald Media, which led (and this part is unstated) MacDonald Media to end the deal with National Experiential, which caused National Experiential to suffer damages.

Read as a whole, the theory of Count IV appears to be that MB, the CSC, and Bachman induced the City to breach its contract with National Experiential, which caused National Experiential to suffer a loss. The contract at issue is the License Agreement between the City and National Experiential. *Id.* at ¶ 69 (alleging that Defendants "interfered with the Plaintiff's contract with the City of Chicago"). The complaint does not appear to allege that MB, the CSC, and Bachman induced a breach of the contract between Nike and MacDonald Media, or the contract between MacDonald Media and National Experiential.

As the Court understands it, the complaint referred to the downstream effects (*i.e.*, the cancellation of the project by Nike) because it informed National Experiential's damages theory. That is, National Experiential suffered lost profits because it couldn't perform under its contract with MacDonald Media. *Id.* at ¶ 73 (seeking "lost profits on its Nike related contract with

McDonald [sic] Media"). But if National Experiential intended something else, it can amend the complaint.

The last remaining claim about the contract is the tortious interference claim against the City. *Id.* at Count V. National Experiential alleges that "[w]hen the City breached the Millennium Park License Agreement contract it intentionally interfered in Plaintiff's contract with McDonald [sic] Media in order to facilitate the display by another private company, the Chicago Bulls." *Id.* at ¶ 76.

National Experiential doesn't allege that the City interfered with the City's contract with National Experiential. No such claim could survive, because a party can't tortiously interfere with its own contract. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003); *see also Douglas Theater Corp. v. Chicago Title & Tr. Co.*, 288 Ill. App. 3d 880, 224 Ill. Dec. 249, 681 N.E.2d 564, 567 (1997) ("[A] party cannot tortiously interfere with his own contract; the tortfeasor must be a third party to the contractual relationship").

Instead, the complaint alleges that the City tortiously interfered with National Experiential's contract with MacDonald Media when the City cancelled the deal with National Experiential. The theory is that the City breached the contract with National Experiential, which interfered with National Experiential's contract with MacDonald Media. *See* Cplt., at ¶ 76 (Dckt. No. 1) ("When the City of Chicago breached the Millennium Park License Agreement contract it intentionally interfered in Plaintiff's contract with McDonald [sic] Media in order to facilitate the display by another private company, the Chicago Bulls.").

That claim fails, too. There are no facts in the complaint that could give rise to a plausible inference that the City induced MacDonald Media to breach its contract. The complaint alleges that the City "tortiously interfered" by "breach[ing]" the deal with National

Experiential. *Id.* But making it more difficult (or impossible) for someone else to perform is not the same thing as tortious interference.

Tortious interference requires a statement by the defendant to encourage someone else to break a contract. *See Webb*, 906 F.3d at 579 ("Intent to induce [a breach of contract] 'requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way.'"). And here, there are no such facts. The complaint does not allege that the City encouraged MacDonald Media to breach its contract with National Experiential.

In sum, the Court dismisses the breach of contract claim against the City (Count III), as well as the tortious interference claims against MB, the CSC and Bachman (Count IV) and against the City (Count V).

## IV.    Civil Conspiracy (Count VI)

National Experiential's last claim is a civil conspiracy claim against all Defendants. It alleges that Defendants conspired to tortiously interfere with National Experiential's contracts and deprive it of its First Amendment free speech rights.[3] *See* Cplt., at ¶ 83 (Dckt. No. 1).

A conspiracy claims requires an underlying bad act. In light of the dismissal of the free speech and tortious interference claims (with leave to amend), the Court dismisses the civil conspiracy claim, too. *See Wheeler v. Piazza*, 364 F. Supp. 3d 870, 880 (N.D. Ill. 2019)

---

[3] As an aside, the parties do not explain whether the civil conspiracy claim is a federal conspiracy claim for a deprivation of constitutional rights or a state law claim alleging a conspiracy to commit a tortious act. Illinois law does not recognize a freestanding claim of civil conspiracy. *See Mitchell v. Village of Matteson*, 2020 WL 3035965, at *7 (N.D. Ill. 2020) (citing *Mauvais-Jarvis v. Wong*, 2013 IL App (1st) 120070, 370 Ill. Dec. 98, 987 N.E.2d 864, 894 (2013), and *Pluciennik v. Vandenberg*, 2018 IL App (3d) 160726, 428 Ill. Dec. 50, 121 N.E.3d 462, 468 (2018)); *Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019). Instead, "it is a means of establishing vicarious liability among coconspirators for an underlying tortious act, even if that act was performed by only one person." *Mitchell*, 2020 WL 3035965, at *7. In any event, it does not matter here. In light of the dismissal of the other claims (with leave to amend), there is no underlying bad act.

(requiring a deprivation of constitutional rights for a section 1983 conspiracy claim); *Dickman v. Off. of the State's Attorney of Cook Cnty.*, 2018 WL 1377807, at \*10 (N.D. Ill. 2018) (requiring a deprivation of a right or privilege under the Equal Protection Clause for a section 1985(3) claim); *Lewis v. Lead Indus. Ass'n*, 2020 IL 124107, 449 Ill. Dec. 195, 178 N.E.3d 1046, 1053 (2020) (requiring an injury caused by an unlawful over act for an Illinois civil conspiracy claim).

### Conclusion

Defendants' motions to dismiss are hereby granted. The Court grants Plaintiff leave to file an amended complaint no later than two weeks after entry of this Order.

Date:  March 9, 2022

_____
Steven C. Seeger
United States District Judge