**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL EXPERIENTIAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-810 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, MB REAL ESTATE | ) | |
| SERVICES, INC., CHICAGO | ) | |
| CONVENTION AND TOURISM | ) | |
| BUREAU, INC. d/b/a CHICAGO SPORTS | ) | |
| COMMISSION, and KARA BACHMAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The City of Chicago hosted the NBA All-Star Game in February 2020. It was a marquee day for a marquee sport, showcasing some of the best athletes in the world at the top of their game. From a marketing perspective, it was a target-rich environment, presenting a world of opportunities for anyone who wanted to promote their brands and get the word out.

National Experiential, a marketing and advertising company, planned to get in on the game. It signed a deal with Nike for a laser-light display on two skyscrapers in downtown Chicago. The display would feature a jaw-dropping, gravity-defying feat by a Chicago Bulls legend. It would show a video of Michael Jordan's unimaginable, unforgettable dunk during the 1988 slam-dunk contest, plus the Nike "Jumpman" logo.

National Experiential also entered into a contract with the City, which gave National Experiential a license to project images from Millennium Park. But the contract gave the City sweeping rights to cancel at any time, for any reason. And it required National Experiential to obtain any necessary permits.

With the license in hand, National Experiential thought that it was in the clear. National Experiential didn't think that it needed a permit based on representations from MB Real Estate Services (the manager of Millennium Park).

Two days before the planned event, National Experiential got a rude wake-up call. MB emailed National Experiential and announced that the project was "not approved" because National Experiential lacked the requisite permits.

MB's email threw National Experiential for a loop. National Experiential tried to convince the City that it didn't need permits because the display was artistic, rather than commercial. That effort fell flat.

Things went from bad to worse. On the day of the planned projections, Kara Bachman from the Chicago Sports Commission (a private entity) entered the fray. She informed National Experiential in no uncertain terms that its project was "NOT APPROVED." Not much later, the City followed up and formally turned the lights out on the project.

After the City pulled the plug, Nike told National Experiential that the light show was not happening. No video display went forward. But the buildings didn't go dark. One of them was lit up in red – the color of the Chicago Bulls. (As an aside, it was also Valentine's Day.) As the complaint tells it, the Chicago Sports Commission had lobbied for the red lighting to promote the Bulls from the get-go, behind the scenes.

National Experiential didn't get to put on the displays after all. As National Experiential sees things, it got a lesson in how things work in Chicago.

National Experiential responded by filing a six-count complaint against the City, the Chicago Sports Commission, its director (Kara Bachman), and MB Real Estate Services (again, the manager of Millennium Park). The lawsuit has spawned two rounds of motions to dismiss.

This Court previously granted the first round of motions, but gave National Experiential leave to amend.

National Experiential amended its complaint, advancing eight claims. The amended complaint includes four First Amendment claims, one breach-of-contract claim, two tortious interference claims, and a civil conspiracy claim. Defendants moved to dismiss the amended complaint.

For the reasons stated below, the Court grants in full the motions to dismiss filed by MB, the CSC, and Bachman. The Court grants in part and denies in part the City's motion to dismiss.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

The Court assumes familiarity with the facts from its ruling on Defendants' first motions to dismiss. *See* 3/9/22 Mem. Opin. & Order (Dckt. No. 68). Even so, National Experiential has now filed an amended complaint, which must stand on its own two feet. "It is axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void." *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004). So the Court rehashes the facts below.

I.     **The Project**

National Experiential is an advertising and marketing agency.  *See* Am. Cplt., at ¶ 8 (Dckt. No. 72).  It heightens brand awareness through laser projections, digital installations, and street-level displays.  *Id.*

In December 2019, National Experiential contracted with MacDonald Media to provide display services in Chicago during NBA All-Star weekend, from February 14–16, 2020.  *Id.* at ¶ 9.  Specifically, the company would place video projections over two buildings – the Prudential Building and the Aon Center – on the nights of February 14 and 15, 2020.  *Id.*  Both buildings are skyscrapers at the north end of Millenium Park.

Millenium Park is a jewel in downtown Chicago.  It is a massive park in the heart of the City, in between the Loop and Lake Michigan.  It is chock-full of sculptures, paths, and well-manicured greenery.  It boasts a 4,000-seat amphitheater, an interactive art display with a water feature called *Crown Fountain*, and even an ice-skating rink.  Millenium Park includes the iconic "Cloud Gate" sculpture, affectionally called "The Bean."

The skyscrapers on the north end of Millenium Park – the Prudential Building and the AON Center – often provide a canvas for messaging through illuminations.  Anything projected on those buildings is a real eye-catcher for that part of the City, especially everyone trapped in heavy traffic on Lake Shore Drive.

Sometimes the Prudential Building and the Aon Center are lit up to celebrate an event or raise awareness, like green for St. Patrick's Day or pink for breast cancer.  Sometimes the buildings turn on the interior lights in certain rooms (only), and spell words.  When the lights are viewed from afar, the lights look like letters, making what looks like a gigantic Lite-Brite.

And sometimes the buildings have advertisements displayed on them, through laser light shows or other illumination. That's what National Experiential planned to do for Nike.

On the Prudential Building, National Experiential planned to project a video of Michael Jordan dunking during the 1988 NBA All-Star Game. *See id.* at 4. The Aon Center projection would feature the word "UNITE," with the Nike "Jumpman" logo taking place of the "I." *Id.*

After contracting with MacDonald Media, National Experiential got to work on logistics. It contacted the City of Chicago Department of Cultural Affairs and Special Events ("DCASE"). *Id.* at ¶ 10. It got in touch with the operators of the two buildings. *Id.* And it reached out to MB Real Estate Services, the manager of Millennium Park. *Id.*

On December 10, 2019, National Experiential received an email from Jonathon Scott, MB's Private Events Manager of Millennium Park. *Id.* Scott gave an estimate on the cost of using the park space for the equipment. *Id.*

More importantly, Scott addressed whether National Experiential would have to meet any permitting requirements. Scott wrote that he had "checked with the city and they feel as long as you have permission from the buildings, there shouldn't be a Special Event Permit Application needed but we will need to loop in the Mayor's Office, 1st District and 42nd Ward for awareness." *Id.* Nonetheless, Scott said that he would send the City a letter with details about the project, "so no surprises pop up." *Id.*

On January 28, 2020 – with just over two weeks until gameday – National Experiential touched base with Scott again, suggesting an in-person meeting to see the site and discuss the event. *Id.* at ¶ 12. Scott responded and asked for a "description, dates and times of what you are producing," as well as "approvals from Prudential and AON." *Id.* Like before, Scott promised to send a letter to the City "so no surprises pop up." *Id.*

5

In the ensuing email thread, National Experiential provided a basic overview of the project and noted that it was waiting for written confirmation of building approval. *Id.* at ¶ 13. Scott asked for "a couple of paragraphs describing what you are actually doing / projecting on the two buildings, [and] the dates and times the light show will be occurring." *Id.* Scott said that he would "send this on to the city for approval." *Id.*

On January 29, 2020, National Experiential sent Scott a formal letter that described the project and included links to videos of the projections that would be used. *Id.* at ¶ 14. Scott passed that information along to the City. *Id.* National Experiential also sent Scott a video mockup of the Nike presentation, showing the "Jumpman" logo. *Id.* at ¶ 15.

MB gave National Experiential an update on February 3, 2020, about a week and a half before the light show. *Id.* at ¶ 16. It shared that it had "just spoke[n] to the City of Chicago to make sure that the Alderman and DCASE are aware that Nike's Light Promo for the NBA is taking place." *Id.*

MB also asked National Experiential to pass along written confirmation of approval by the Prudential Building and the Aon Center. *Id.* National Experiential sent the approvals the next day. *Id.* at ¶ 17.

## II.    The Contract

On February 5, 2020, National Experiential executed a license agreement with the City for a "Nike Light Promo for NBA All-Star Game" in Millennium Park. *Id.* at ¶ 18. The agreement gave the company permission to build two temporary structures in the park for its projection equipment. *Id.* It specified that the "Permitted Use" was for a "*Nike Light Promo for NBA All-Star Game.*" *Id.* (emphasis in complaint).

6

The contract did not say that National Experiential did not need a permit. And the contract did not purport to *grant* a permit, either. Quite the opposite. The License Agreement called attention to the fact that National Experiential might need a permit, if local ordinances required a permit for this particular project.

Specifically, paragraph eight of the License Agreement incorporated by reference the terms of the "General Conditions," meaning the exhibit attached to the contract. *See* License Agreement, at ¶ 8 (Dckt. No. 34-1, at 4 of 17). And paragraph eleven of the General Conditions flagged the possible need for a permit: "Licensee shall obtain and pay for all necessary permits and licenses, if any, required for the entertainment or activity being presented . . . ." *See* General Conditions, at ¶ 11 (Dckt. No. 34-1, at 8 of 17).

The License Agreement also gave the City wide latitude to cancel the contract in its entirety. "This license agreement is revocable and may be terminated by the City at any time and for any reason." *See* License Agreement, at ¶ 8 (Dckt. No. 34-1, at 5 of 17).

The City signed the Millennium Park license agreement on February 7, 2020. *See* Am. Cplt., at ¶ 24 (Dckt. No. 72). That same day, MB sent an email (presumably to National Experiential, but the complaint does not specify) confirming that "National Experiential has permission to utilize Millennium Park to house projection tents and projectors for an activation related to the NBA 2020 All-Star game . . . ." *Id.* at ¶ 25.

With its contract in place, National Experiential got to work. On February 8, it paid the City $116,044.50 to use the space. *Id.* at ¶ 26. It paid $325,000 in fees to the owners of the Aon Center and the Prudential Building, too. *Id.* at ¶ 28.

On the ground in the park, the company began building temporary structures and setting up its projection equipment. *Id.* at ¶ 27. The City provided National Experiential with licensed electricians and security under the contract. *Id.*

### III. The Termination

Everything seemed to be following the gameplan. But a surprise popped up on February 12, 2020, just two days before the tipoff of All-Star weekend.

MB employee Micah Lane sent National Experiential an email pulling the plug on the project. *Id.* at ¶ 29. Lane delivered bad news: "[the] activation [of the Millennium Park Project] will not be moving forward and all activity related to this activation should cease immediately to mitigate costs for all involved." *Id.*

Lane gave a reason for the project shutdown: National Experiential did not have a zoning permit. *Id.* at ¶ 30.

National Experiential was caught off guard. According to National Experiential, the City had informed it in December 2019 that no permit was needed.[1] *Id.* at ¶ 31. Plus, the City's contract provided that the light show counted as a "Permitted Use." *Id.*

The Chicago Zoning Ordinance defines "Permitted Use" as a "use permitted by-right in the subject zoning district in accordance with the applicable use regulations of this Zoning Ordinance." *Id.* at ¶ 20 (citing MCC § 17-17-02119). According to National Experiential, "by-right" means "no permit required." *Id.* at ¶ 21.

---

[1] The Court assumes that the complaint is referring to the email from MB to National Experiential in December 2019. MB told National Experiential that the City did not require a permit. *See* Am. Cplt., at ¶ 10 (Dckt. No. 72). So, National Experiential heard about the City's position from MB, not from the City directly. The complaint does not appear to allege that the City expressly told National Experiential that it did not need a permit.

After Lane shut things down, National Experiential tried to turn things around.  It tried to get permission from the City.  But the City pointed to a local ordinance regulating signage.

The ordinance bans temporary illuminated signs, and dynamic image displays. "*Temporary signs* may not be illuminated.  *Changing-image sign* features and electronic elements are prohibited."  *See* MCC § 17-12-0804-A (emphasis in original); *see also* MCC § 17-17-02176 (defining a "temporary sign").

But section 17-12-0804-E of the Chicago Zoning Ordinance gives authority to the Zoning Administrator for special event signs.  "The Zoning Administrator is authorized to issue temporary sign permits for special event signs and to impose time limits and other restrictions on the use, location, dimensions and characteristics of such signs to ensure that they are consistent with the purposes of this chapter."  *See* MCC § 17-12-00804-E; *see also* MCC § 17-12-0100 (describing the wide-ranging "purposes of this chapter").

The ordinance also exempts works of art that have no commercial message.  *See* MCC § 17-12-0500 ("The following are exempt from regulation under this Zoning Ordinance and do not require *sign* permits . . . Works of art with no *commercial message*.") (emphasis in original); *see also* MCC § 17-17-0236 (defining the term "commercial message" as "[a]ny *sign*, wording, logo or other representation that, directly or indirectly, names, advertises or calls attention to a business, product, service or other commercial activity") (emphasis in original).

National Experiential didn't have a permit, and it wanted to put up an illuminated, dynamic image display, including a Nike logo.  That plan was problematic, because the ordinance seemed to prohibit what National Experiential wanted to do.

With time slipping away, National Experiential tried to salvage its plans. It tried to convince the City that the projections were artistic, and therefore were not subject to the zoning ordinance. *Id.* at ¶ 32.

The City wasn't convinced. On the afternoon of February 14, 2020 – just hours before showtime – Patrick Murphey, Chicago's Zoning Administrator, emailed National Experiential. He made a cryptic comment that bigger things were afoot: "this has evolved into a much larger issue that appears to go well beyond zoning." *Id.*

Later that afternoon, Nike passed along materials to the City about the projections being artistic, rather than commercial. *Id.*

Ten minutes after Nike's email, Chicago Sports Commission Executive Director Kara Bachman threw her weight around and dropped the hammer. *Id.* at ¶ 33. Bachman told National Experiential: "You do not have approval to project. It's simple. NOT APPROVED." *Id.*

Bachman's name was new to National Experiential. Until then, Bachman was not actively involved in any aspect of the project. *Id.*

And Bachman is not an employee of the City, either. *Id.* at ¶ 35. The Chicago Sports Commission ("CSC") is a powerful *private* "business league." *Id.* at ¶ 34. Its members include Chicago's most powerful business and sports leaders – including representatives from the Chicago Bulls. *Id.* at ¶¶ 34, 37.

The CSC exerts influence within the City. But it isn't a part of the City, and it doesn't have the power to approve or disapprove anything on the City's behalf.

National Experiential has a theory about why Bachman butted in. Apparently, back in December 2019, Bachman and the CSC had asked the owners of the Prudential Building to light up the skyscraper with Bulls red during All-Star weekend. *Id.* at ¶ 36. So, according to the

10

complaint, Bachman and the CSC wanted National Experiential's project scrapped. To that end, they began pressuring City officials and MB behind the scenes by at least February 12, 2020. *Id.* at ¶ 37.

The CSC may not be the City. But in the end, the City agreed with the CSC.

Hours after Bachman delivered her thunderbolt, Anne Hickey, an employee of the City, confirmed the cancellation of National Experiential's Millennium Park License Agreement. *Id.* at ¶ 38. Hickey explained that the "proposed event would not be permissible under various sections of the Municipal Code of Chicago." *Id.*

Hickey did not reference those sections by name. *Id.* She also did not explain why she had countersigned the contract a week earlier, listing the event as a "Permitted Use" without identifying any approvals that National Experiential still needed. *Id.*

Nike lost enthusiasm for the projections, too. It emailed National Experiential that the projections were "not approved," and instructed it to refrain from lighting up the buildings. *Id.* at ¶ 40. So, National Experiential gave up on the project. *Id.* at ¶ 41.

In the end, the CSC got just what it wanted. "[It] arranged to have the Prudential Building illuminated in the Chicago Bull's red during the NBA's All-Star game weekend, and it was so illuminated." *Id.* at ¶ 42.

## IV.     The Litigation

The lights went out on National Experiential's laser-light display. So, the company turned to the federal courthouse. National Experiential filed this lawsuit against the City, MB, the CSC, and Bachman.

Separately, National Experiential also filed a second lawsuit against Nike and an advertising agency. That case is pending before this Court, too. *See Nat'l Experiential, LLC v.*

11

*Nike, Inc., et al.*, 21-cv-4551 (N.D. Ill.).  It also filed a third lawsuit against MacDonald Media (that case is pending in New York).  *See Nat'l Experiential, LLC v. MacDonald Media, LLC*, Index No. 604302/2020 (N.Y.).

In the case at hand, Defendants moved to dismiss.  The Court converted that motion to a motion for a more definite statement, which the Court granted.  But the Court granted leave to amend.  *See* 3/9/22 Mem. Opin. & Order, at 2 (Dckt. No. 68).

National Experiential then filed an amended complaint with eight claims:  four claims under the First Amendment (Counts I–IV), one count for breach of contract (Count V), two counts alleging tortious interference with contract (Count VI & VII), and one count for civil conspiracy (Count VIII).  *See* Am. Cplt. (Dckt. No. 72).

Count I is against all Defendants, and includes both a facial and an as-applied challenge to the City's ordinances.  Under that count, the complaint alleges that the City's ordinances are content-based and "illegally discriminated against Plaintiff's temporary sign projection – which contained both commercial and artistic aspects – by requiring a permit."  *Id.* at ¶¶ 43–59.

Counts II, III, and IV are against the City of Chicago only.

Count II raises a facial challenge to the City's zoning ordinance banning illuminated temporary signs, since the ordinance excludes artistic (non-commercial) signs.  *Id.* at ¶¶ 61, 63.

Count III seemingly claims that the City discriminated against National Experiential by requiring a permit for its temporary illuminated sign, while not imposing the same requirement on others who engaged in commercial speech.  *Id.* at ¶¶ 68–70.

Count IV is a facial and an as-applied challenge to a Chicago ordinance, which allegedly allows the Zoning Administrator to pretextually or arbitrarily "mak[e] it very difficult for

persons to conform to the law." *Id.* at ¶¶ 72–74. In other words, the claim is about unfettered discretion.

Count V alleges that the City breached its contract with National Experiential. *Id.* at ¶¶ 77–94. National Experiential admits that the agreement "gave the City the express contractual right to cancel the Agreement at any time for any reason." *Id.* at ¶ 89. Nonetheless, it argues that the agreement was "substantially unfair and unconscionable relative to the parties' assumed obligations." *Id.* at ¶ 91.

Count VI is against MB, the CSC, and Kara Bachman. It alleges that those Defendants tortiously interfered with National Experiential's contract with the City. *Id.* at ¶¶ 96–101.

Count VII claims that the City tortiously interfered with National Experiential's contract with MacDonald Media. *Id.* at ¶¶ 103–06. It is against only the City.

Finally, Count VIII is a civil conspiracy claim against all Defendants. *Id.* at ¶¶ 108–11.

Once again, Defendants moved to dismiss for failure to state a claim. *See* Defs. CSC and Bachman's Mtn. to Dismiss Pl.'s Am. Cplt. (Dckt. No. 75); Def. City of Chicago's Mtn. to Dismiss Pl.'s Am. Cplt. (Dckt. No. 76); Def. MB's Mtn. to Dismiss Pl.'s Am. Cplt. (Dckt. No. 79).

The City also challenges National Experiential's standing to bring Count IV, meaning the claim about the Zoning Administrator's excessive discretion, under Rule 12(b)(1). *See* Def. City of Chicago's Mem. in Support of Mtn. to Dismiss Pl.'s Am. Cplt., at 11 (Dckt. No. 77).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all

well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

A motion to dismiss under Rule 12(b)(1) challenges whether this Court has subject matter jurisdiction over a claim or case. *See* Fed. R. Civ. P. 12(b)(1); *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021). "A standing challenge under Rule 12(b)(1) typically can take the form of a facial or a factual attack on the plaintiff's allegations." *Id.* (cleaned up). "A facial attack tests whether the allegations, taken as true, support an inference that the elements of standing exist, and a factual attack tests the existence of jurisdictional facts underlying the allegations." *Id.* (cleaned up).

To evaluate a facial attack, the Court looks to the complaint to see if the plaintiff sufficiently alleged a basis of subject matter jurisdiction. *Id.* The Court accepts "all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Id.*

**Analysis**

## I.      First Amendment Claims

The first four counts are First Amendment claims.  *See* Am. Cplt., at ¶¶ 43–74 (Dckt. No. 72).  Count I is against all Defendants, and Counts II, III, and IV are against the City (only).

Count I is a facial and an as-applied challenge to the City's ordinances.  *Id.* at ¶¶ 43–59.

Count II raises a facial challenge to the City's zoning ordinance that prohibits illuminated temporary signs, because the ordinance excludes artistic (non-commercial) signs.  *Id.* at ¶¶ 61, 63.

Count III seems to claim that the City discriminated against National Experiential by requiring a permit for its temporary illuminated sign, while allowing others to display similar signs without a permit.  *Id.* at ¶¶ 68–70.

Count IV challenges the amount of discretion given to a zoning official.  The ordinance allegedly allows the Zoning Administrator to pretextually or arbitrarily "mak[e] it very difficult for persons to conform to the law."  *Id.* at ¶¶ 72–74.

Before diving into the claims, the Court offers a word of caution.  In its ruling on the original complaint, the Court *sua sponte* converted the motion to dismiss into a motion for a more definite statement.  The complaint was not a model of clarity, and it was a bit of a mystery about what, exactly, National Experiential was alleging.  *See* 3/9/22 Mem. Opin. & Order, at 12 (Dckt. No. 68); *see also id.* at 17 ("For the sake of efficiency, the Court will not guess what National Experiential is claiming.  Instead, a better approach is to sharpen the pleadings, pin down the claims, and go from there.").

Some wiggle might be unavoidable.  After all, "First Amendment law has been called labyrinthine for good reason.  It consists of overlapping doctrines, maddeningly inconsistent

15

rulings and an uncertain future." *See* David L. Hudson, Jr., *The First Amendment: Freedom of Speech* § 2:1 (2012).

And a complaint does not need to pin down a precise legal theory, anyway. *See, e.g.*, *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) ("Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief'; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.") (citation omitted); *Zimmerman v. Bornick*, 25 F.4th 491, 493 (7th Cir. 2022) ("Rule 8(a) does not require plaintiffs to 'pin' their claim for relief to any particular legal theory at the pleading stage.").

Even so, the First Amendment claims in the amended complaint remain somewhat mushy. At times, it is difficult to pin down what, exactly, National Experiential is alleging or arguing. But the Court will wade through it, particularly with the aid of the parties' briefs. So, the Court will do its level-best to sift through the First Amendment claims on this second go-round.

The Court will begin with a threshold question: whether MB, the CSC, and Bachman are suable under section 1983. Then, the Court will march through Counts I through IV.

### A. State Actors

MB, the CSC, and Bachman contend that they cannot be held liable under section 1983 because they are private actors. *See* Defs. CSC and Bachman's Mtn. to Dismiss, at 2–3 (Dckt. No. 75); Def. MB's Mem. in Support of Mtn. to Dismiss, at 3–7 (Dckt. No. 80).

The text of the First Amendment prohibits "Congress" from restricting free speech. *See* U.S. Const. amend. I. But courts have applied the First Amendment to government actors more

16

generally, including the executive branch. And the First Amendment applies to the states, too, thanks to the Fourteenth Amendment.

State actors are one thing; private actors are another. The First Amendment "protect[s] citizens from conduct by the government, but not from conduct by private actors, no matter how egregious that conduct might be." *Hallinan v. Fraternal Ord. of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009). Therefore, to bring a First Amendment claim, a plaintiff must plead state action, which typically means suing the government. *See Stagman v. Beverly Bank & Tr.*, 2017 WL 4265721, at *3 (N.D. Ill. 2017) (St. Eve, J.).

The text of section 1983 underscores the need for state action. The statute authorizes courts to hear claims against defendants who act "under color of" state law. *See* 42 U.S.C. § 1983. "[P]rivate actors . . . cannot usually be sued under § 1983." *See Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 825 (7th Cir. 2019).

But there are exceptions. "[A] private entity can qualify as a state actor in a few limited circumstances – including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019) (citations omitted).

"At its most basic level, the state action doctrine requires that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823–24 (7th Cir. 2009) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

Here, the third circumstance – joint action – takes center stage.

17

The Seventh Circuit has referred to this exception as the "conspiracy theory" of section 1983 liability, or as the "joint participation doctrine." *See Alarm Detection Sys.*, 930 F.3d at 825. Under this theory, "if a private actor conspires with a state actor to deprive someone's constitutional rights, the private actor may be subject to a § 1983 suit." *Id.*; *see also Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) ("[A] private citizen can act under color of law if there is evidence of a *concerted effort* between a state actor and that individual.") (emphasis in original) (quotation marks omitted).

"Because § 1983 allows a private actor to be sued as if it were the state and makes state actors potentially liable as well, the state actor must share the private actor's unconstitutional goal in order for a state actor to be acting under color of state law." *Wilson v. Warren Cnty.*, 830 F.3d 464, 468 (7th Cir. 2016).

"[M]ere allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss." *Spiegel*, 916 F.3d at 616. "This requires evidence of a concerted effort between a state actor and that individual." *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (cleaned up); *see also Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991) ("A requirement of the joint action charge . . . is that both public and private actors share a common, unconstitutional goal."). "Circumstantial evidence can support an inference of a conspiracy, but speculation cannot." *Dalla Costa v. Ramaiah*, 2023 WL 5581261, at *20 (N.D. Ill. 2023).

National Experiential believes that the First Amendment applies to MB, the CSC, and Bachman because "these Defendants worked together with the City to preclude Plaintiff's speech

and promote the pre-existing plan of the CSC to illuminate the Prudential Building." *See* Pl.'s Joint Resp., at 9 (Dckt. No. 85).

When it comes to alleging state action, the complaint is long on legal conclusions and short on facts. National Experiential alleges that Defendants were "joint tortfeasors" and engaged in "concerted action." *See* Am. Cplt., at ¶ 58 (Dckt. No. 72) (alleging that Defendants "operated as joint tortfeasors to deprive Plaintiff of its First Amend[ment] freedom . . . ."); *see also id.* at ¶ 108 (asserting that Defendants "agreed among themselves by email and/or phone calls to accomplish, by concerted action, the termination of Plaintiff Millennium Park License Agreement and Plaintiff's contract with McDonald Media and Nike").

The complaint does not offer any facts that could give rise to a plausible inference that Defendants conspired to deny National Experiential's constitutional rights. It merely states the legal conclusion that Defendants were joint tortfeasors, which is not enough. *See Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 513 (7th Cir. 2020) (explaining that "legal conclusions and conclusory allegations are not entitled to the presumption of truth" in ruling on a motion to dismiss) (cleaned up); *see also Dalla Costa*, 2023 WL 5581261, at *21 ("[S]imply alleging that there was a conspiracy . . . isn't enough.").

National Experiential has not plausibly pleaded that MB, the CSC, and Bachman (*i.e.*, the private actors) had a "meeting of the minds" and "reached an understanding" with the City (*i.e.*, the state actor) to deprive National Experiential of its First Amendment rights. *See Wilson*, 830 F.3d at 468 (cleaned up).

The complaint does allege that the CSC "exerted pressure behind the scenes" to get the City to cancel the project. *See* Am. Cplt., at ¶ 3 (Dckt. No. 72). But *pressuring* someone to act is not the same as *conspiring* with them. *See, e.g., Max v. Republican Comm. of Lancaster Cnty.*,

587 F.3d 198, 203 (3d Cir. 2009) (concluding that defendant did not engage in state action by instructing poll-workers to report information about election day efforts by plaintiff); *Naguib v. Illinois Dep't of Pro. Regul.*, 986 F. Supp. 1082, 1093 (N.D. Ill. 1997) (encouraging the government to initiate an investigation, and providing it with false information, is not sufficient to show meeting of the minds for a section 1983 claim); *Howard v. Bd. of Educ. of Sycamore Cmty. Unit Sch. Dist. No. 427*, 876 F. Supp. 959, 968 (N.D. Ill. 1995) (similar).

After all, MB, the CSC, and Bachman had free speech rights, too. They were entitled to speak their minds, lobby the government, and advocate for their point of view – just like National Experiential. Everyone can speak up, and no one is entitled to exclusive use of the microphone. A person's right to free speech does not mean that the other side must keep their mouths shut.

Advocating for a position before government officials is not state action, either. If it were, then a lobbyist could be held liable under section 1983 whenever a governmental official acted on his recommendation.[2] Encouraging the government to take action, without more, does not transform a private actor into a state actor.

In sum, National Experiential failed to plead that MB, the CSC, and Bachman engaged in state action. The Court grants those Defendants' motions to dismiss Count I.

---

[2] The parties do not raise the issue of *Noerr-Pennington* immunity. The *Noerr-Pennington* doctrine protects the First Amendment right to petition. *See New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). *Noerr-Pennington* has its origins in antitrust law, but the Seventh Circuit has applied it in the section 1983 conspiracy context, too. *See Tarpley v. Keistler*, 188 F.3d 788, 795 (7th Cir. 1999) (applying *Noerr-Pennington* in a section 1983 case involving an alleged First Amendment violation); *Sheikh v. Rabin*, 565 F. App'x 512, 517 (7th Cir. 2014) (suggesting that the *Noerr-Pennington* doctrine would pose a "significant hurdle" for plaintiff who sued his neighbors "because they had voiced opposition to the variances he wanted from the city council and zoning board"). Given the lobbyist-like nature of the alleged behavior of MB, Bachman, and the CSC, *Noerr-Pennington* could spell trouble for National Experiential's First Amendment claim against those Defendants. But the parties don't raise the issue, so the Court declines to reach it.

### B. Commercial vs. Artistic Speech (Count I)

The next question is whether Count I can go forward against the City. National Experiential brings a facial challenge and an as-applied challenge to the City's ordinances. *See* Am. Cplt., at ¶¶ 43–59 (Dckt. No. 72).

The City contends that Count I tosses together a "murky and mysterious" "jumble of allegations." *See* Def. City of Chicago's Mem., at 3 (Dckt. No. 77); *see also id.* ("Count I contains a laundry list of allegations having little to no relevance to any type of freedom of speech claim."). That's not off by much. Count I has wiggle, and lacks clarity.

National Experiential seems to allege that multiple municipal ordinances violate the First Amendment. *See* Am. Cplt., at ¶ 54 (Dckt. No. 72) ("The City of Chicago ordinances on their face and as applied illegally discriminated against Plaintiff's temporary sign projection – which contained both commercial and artistic aspects – by requiring a permit affectively [sic] wrongly denying Jumpman under a content based distinction and in so doing denied Plaintiff's right to free speech.").

Count I also floats the idea that the City improperly distinguishes "between commercial and art speech." *Id.* at ¶ 52. And it alleges that the City violated National Experiential's constitutional rights "by requiring a permit for its protected speech but not requiring a permit of the CSC and the Prudential Building when they lit the building in the colors of the privately owned Chicago Bulls after Plaintiff had been barred from projecting images." *Id.* at ¶ 55.

National Experiential's brief offers a little more clarity. *See* Pl.'s Joint Resp., at 2 (Dckt. No. 85). According to the brief, National Experiential aims to make two allegations in Count I. First, it alleges that "the City's sign ordinance makes content-based distinctions between commercial and artistic speech and is subject to strict scrutiny . . . ." *Id.* Second, it alleges that

21

Defendants "engaged in viewpoint discrimination" by preventing National Experiential from displaying the Nike light show without a permit but allowing the CSC to light up the Prudential Building in red without a permit. *Id.*

The Court will consider each argument in turn.

### 1. Content-Based Distinction (Commercial vs. Artistic Speech)

National Experiential seems to concede that its message is commercial speech, rather than artistic speech. That concession seems unavoidable. After all, National Experiential wanted to promote Nike, a towering figure in the big business of sports. The "Jumpman" logo is one of the most recognizable, most sought-after, most valuable commercial marks in the world.

National Experiential also acknowledges that the City's municipal code distinguished between commercial speech and artistic speech. *See* Am. Cplt., at ¶ 52 (Dckt. No. 72). Specifically, the ordinance exempted from zoning regulations "[w]orks of art with no *commercial message*." *See* MCC § 17-12-0504; *see also* Am. Cplt., at ¶ 50.

The parties disagree about whether strict or intermediate scrutiny applies, so the Court must take up that question before addressing the merits of the claim.

### a. *Reed v. Town of Gilbert* & Strict Scrutiny

National Experiential argues that the Supreme Court's decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), abolished the distinction between commercial and artistic speech. *See* Am. Cplt., at ¶ 52 (Dckt. No. 72). Based on *Reed*, National Experiential believes that distinguishing between commercial and artistic speech – as the Chicago municipal code does – warrants strict scrutiny. *Id.*

In *Reed*, the Supreme Court concluded that a municipal code that "single[d] out signs bearing a particular message: the time and location of a specific event" imposed a content-based

22

restriction. *Reed*, 576 U.S. at 171. Because the restriction was content-based, strict scrutiny applied. *Id.* By contrast, when a restriction is content-neutral, intermediate scrutiny will apply. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).

The difference between strict scrutiny and intermediate scrutiny is no small thing. Oftentimes, it is everything.

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. It is a difficult standard to meet: "strict scrutiny leaves few survivors." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 455 (2002) (Souter, J., dissenting).

 "Intermediate scrutiny is not an overly demanding standard, as it does not require a perfect or least restrictive fit." *GEFT Outdoor, LLC v. City of Westfield*, 39 F.4th 821, 825 (7th Cir. 2022). To survive intermediate scrutiny, a restriction must be "narrowly tailored to serve a significant governmental interest." *See Rock Against Racism*, 491 U.S. at 791.

The Supreme Court clarified the impact of *Reed* in *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022). In *City of Austin*, the Supreme Court rejected the Fifth Circuit's broad interpretation of *Reed*. *Id.* at 69. The Fifth Circuit had concluded that, under *Reed*, a municipal prohibition on off-premises signs and billboards constituted content-based speech subject to strict scrutiny. *Id.* at 68.

The Supreme Court reversed. It explained that "[a] regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content' – that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *Id.* at 69 (quoting *Reed*, 576 U.S. at 163).

The Austin ordinance was "content neutral" because it "require[d] an examination of speech only in service of drawing neutral, location-based lines." *Id.*

So, the intermediate scrutiny test for commercial speech, set forth by *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557 (1980), remains good law. *See City of Austin*, 596 U.S. at 68 n.3, 73; *see also Adams Outdoor Advert. Ltd. P'ship v. City of Madison*, 56 F.4th 1111, 1120 (7th Cir. 2023) (approving use of *Central Hudson* test in post-*City of Austin* case about advertising signs).

Before *City of Austin*, the effect of *Reed* on commercial speech was, perhaps, uncertain. But *City of Austin* clarified that the *Central Hudson* test remains good law.

Still, unlike the sign-related ordinances at play in *City of Austin* and *Adams Outdoor*, the ordinance challenged here appears to make a content-based differentiation between types of speech. That is, the ordinance treats commercial speech differently from artistic speech. *See* MCC § 17-12-0504 (exempting "[w]orks of art with no *commercial message*" from regulation under the zoning ordinance) (emphasis in original).

That distinction might warrant strict scrutiny. Courts have looked into that question, and have reached different answers. *See, e.g.*, *Reed*, 576 U.S. at 164 (explaining that the sign regulation was content-based because "[i]f a sign informs its reader of the time and place a book club will discuss John Locke's Two Treatises of Government, that sign will be treated differently from a sign expressing the view that one should vote for one of Locke's followers in an upcoming election, and both signs will be treated differently from a sign expressing an ideological view rooted in Locke's theory of government"); *Florek v. Bedora*, 2023 WL 2808313, at *4 (E.D. Wis. 2023) (concluding that requiring some sign owners to obtain permits, but not others, warranted strict scrutiny under *Reed*, post-*City of Austin*); *Geft Outdoor LLC v.*

24

*Consol. City of Indianapolis & Cnty. of Marion*, 187 F. Supp. 3d 1002, 1014 (S.D. Ind. 2016) ("Applying *Reed* to the case before us, it is clear that the Sign Ordinance's noncommercial exemption constituted a facially content-based restriction, which would subject it to strict scrutiny."). *But see, e.g.*, *RCP Publications Inc. v. City of Chicago*, 304 F. Supp. 3d 729, 735 (N.D. Ill. 2018) (applying *Central Hudson* to challenge about ordinance regulating only commercial signs); *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 195 F. Supp. 3d 1065, 1076 (E.D. Mo. 2016), *aff'd*, 864 F.3d 905 (8th Cir. 2017) (concluding that ordinance that distinguished between professional and amateur photographers was subject to intermediate scrutiny); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 447 n.10 (S.D.N.Y. 2016) (explaining that distinctions between commercial speech and other kinds of speech are inherently content-based, yet *Reed* has not unwound the notion of treating the distinction as content-neutral).

In short, in a post-*Reed*, post-*City of Austin* world, courts have reached differing conclusions about whether strict scrutiny applies to ordinances like the one at hand.

However, at this stage of the game, the Court does not need to determine whether strict or intermediate scrutiny applies. Even if *Central Hudson* applies to the challenge to the ordinance (and intermediate scrutiny applies), National Experiential's claim survives the City's motion to dismiss. *See Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109, 1115 (9th Cir. 2023) ("The parties dispute whether we should review § 22949.80 as a restriction of purely commercial speech under the test announced in *Central Hudson* or as a content- and viewpoint-based restriction of speech under strict scrutiny review. We need not decide this issue because 'the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied.'") (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011)).

### b.    The *Central Hudson* Test & Intermediate Scrutiny

*Central Hudson* laid down a four-part test for cases involving commercial speech.  *See Cent. Hudson*, 447 U.S. at 566.

"At the outset, [a court] must determine whether the expression is protected by the First Amendment.  For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading.  Next, [the court] ask[s] whether the asserted governmental interest is substantial.  If both inquiries yield positive answers, [the court] must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."  *Id.*

National Experiential argues that a district court cannot apply the *Central Hudson* test at the motion-to-dismiss stage.  *See* Pl.'s Joint Resp., at 6 (Dckt. No. 85) ("Because the City must meet its burden under the *Central Hudson* test with evidence . . . the City cannot prevail on a Rule 12(b)(6) motion.").

Not so.  "[C]ourts have engaged in the *Central Hudson* analysis at the motion to dismiss stage and found that commercial-speech restrictions did not violate the First Amendment." *Second Amend. Arms v. City of Chicago*, 135 F. Supp. 3d 743, 758 n.9 (N.D. Ill. 2015) (Dow, J.) (collecting cases); *see also Vugo, Inc. v. City of Chicago*, 273 F. Supp. 3d 910, 917 (N.D. Ill. 2017) ("declin[ing] plaintiffs' invitation to deny the City's motion out of hand on the ground that the City's arguments [about *Central Hudson*] cannot be entertained on a motion to dismiss"); *Contest Promotions, LLC v. City & Cnty. of San Francisco*, 874 F.3d 597, 604 (9th Cir. 2017) (affirming district court opinion granting motion to dismiss challenge to sign ordinance after applying *Central Hudson*); *Poughkeepsie Supermarket Corp. v. Dutchess Cnty.*, 648 F. App'x

156, 158 (2d Cir. 2016) (affirming district court opinion granting motion to dismiss ordinance challenge after applying *Central Hudson*).

If the face of the complaint shows that it flunks the *Central Hudson* test, there is nothing wrong with dismissal. The Court can assess the City's arguments about *Central Hudson* on the merits, so it will.

For commercial speech to come under the First Amendment's protection, it must concern lawful activity and not be misleading. *See Cent. Hudson*, 447 U.S. at 566. The City agrees that National Experiential's display meets this prong. *See* Def. City of Chicago's Mem., at 8 (Dckt. No. 77).

But the parties disagree about the next three steps of the *Central Hudson* analysis. *See id.* As a reminder, "[f]irst, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction on commercial speech directly and materially advances that interest; and third, the regulation must be 'narrowly drawn.'" *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995) (citing *Cent. Hudson*, 447 U.S. at 564–65).

But the Court only needs to reach the argument about whether the City has a substantial interest. The punchline is that more factual development is needed to answer that question.

The City argues that it has a substantial interest in maintaining the aesthetic appeal of the City and preventing "every building in Chicago . . . becom[ing] a make-shift screen for the projection of commercial advertising." *See* Def. City of Chicago's Mem., at 8 (Dckt. No. 77).

The Supreme Court has repeatedly recognized that aesthetics represent a significant government interest. *See, e.g.*, *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981) (opining that "the appearance of the city" is a "substantial governmental goal[]"); *Lavey*

27

*v. City of Two Rivers*, 171 F.3d 1110, 1114 (7th Cir. 1999) ("After the Supreme Court's decision in [*Metromedia*], we do not think that it can be said that the City's interests in traffic and aesthetics are not substantial municipal goals."); *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984) ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values."); *Paramount Media Grp., Inc. v. Vill. of Bellwood*, 2017 WL 590281, at *7 (N.D. Ill. 2017), *aff'd*, 929 F.3d 914 (7th Cir. 2019) ("Aesthetic concerns are widely recognized as legitimate governmental interests that may be addressed by the regulation of signs.").  Chicago is beautiful, and no one wants it to turn ugly.

Indeed, the "purpose" section of the municipal code explains the City's aesthetic interest in regulating signage.  *See* MCC § 17-12-0101 (stating that signage regulations are intended to "promot[e] a safe, well-maintained and attractive city"); MCC § 17-12-0101-C (discussing "promot[ing] an attractive visual environment"); MCC § 17-12-0101-D (discussing goal to "allow for adequate and effective signs, while preventing signs from dominating the appearance of the area") (emphasis removed).[3]

National Experiential points out that the ordinance exempted "artistic" displays from the ban on illuminated dynamic displays.  *See* Pl.'s Joint Resp., at 7 (Dckt. No. 85).  In its view, the fact that the City allows artistic messages to bypass the zoning regulation suggests that the City "had no substantial interest" in applying the ordinance.  *Id.* at 7–8.

"Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination:  They

---

[3]  Failure to state a legislative purpose can doom a First Amendment claim on the second *Central Hudson* prong.  *See, e.g.*, *Lockridge v. Vill. of Alsip*, 2005 WL 946880, at *4 (N.D. Ill. 2005) ("The ordinances' lack of any stated purpose made them necessarily fail the second part of the *Central Hudson* test, which requires that restrictions must seek to implement a substantial government interest.") (quotation marks omitted).

may diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994); *see also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 425 (1993) (rejecting city's proffered justification – *i.e.*, aesthetics – for barring only commercial newsracks and not non-commercial ones because "respondent publishers' newsracks are no greater an eyesore than the newsracks permitted to remain on Cincinnati's sidewalks"); *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 106 (2d Cir. 2010) ("A regulation may . . . be deemed constitutionally problematic if it contains exceptions that 'undermine and counteract' the government's asserted interest.") (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995)).

To be sure, the existence of an exemption does not conclusively show that the City lacked a substantial interest. *See Scadron v. City of Des Plaines*, 734 F. Supp. 1437, 1448 (N.D. Ill. 1990) (Rovner, J.), *aff'd*, 989 F.2d 502 (7th Cir. 1993) (concluding that city's decision to adopt a less restrictive zoning ordinance did not invalidate its aesthetic interest); *Vugo, Inc. v. City of New York*, 931 F.3d 42, 53 (2d Cir. 2019) (concluding that city's ban on some types of advertising, but not other kinds, was not unconstitutional).

But the Court needs to hear more. So, for now, National Experiential can proceed with Count I against the City, to the extent that it attacks the constitutionality of MCC § 17-12-0504.

## 2. Viewpoint Discrimination

Next, the Court turns to the question whether Defendants "engaged in viewpoint discrimination." *See* Pl.'s Joint Resp., at 2 (Dckt. No. 85). Basically, National Experiential argues that the City engaged in viewpoint discrimination when it allowed the CSC to light up the Prudential Building in red – without obtaining a permit – after prohibiting National Experiential's planned display. *See* Am. Cplt., at ¶ 55 (Dckt. No. 72).

29

As the company sees it, the City allowed one message (promoting the Bulls), but not another message (promoting Nike). In National Experiential's view, the City picked a winner and a loser, and did so based on the content of the speech. The City favored pro-Bulls speech and disfavored pro-Nike speech.

The government cannot pick winners and losers when it comes to speech, based on the content of the message. *See Vidal v. Elster*, 602 U.S. 286, 293 (2024) ("Our precedents distinguish further a particularly egregious form of content discrimination – viewpoint discrimination.") (cleaned up); *NRA v. Vullo*, 602 U.S. 175, 187 (2024) ("At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society.").

"The First Amendment limits the power of the government to restrict expression because of the viewpoint it expresses." *Brown v. Kemp*, 86 F.4th 745, 778 (7th Cir. 2023); *see also Shurtleff v. City of Boston*, 596 U.S. 243, 258 (2022). Viewpoint discrimination occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Viewpoint discrimination is an "egregious form of content discrimination." *Id.*

Still, "[d]istinguishing between a permissible content-based restriction and an impermissible viewpoint-based restriction is not always easy." *Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 865 (7th Cir. 2008).

For its part, the City contends that no viewpoint discrimination occurred because lighting up the Prudential Building in red does not constitute a "sign" within the meaning of the ordinance. *See* Def. City of Chicago's Mem., at 5 (Dckt. No. 77) ("[A] monochromatically

illuminated building is not the type of sign contemplated by the municipal code regulations"). And if it wasn't a "sign," then it didn't need a permit.

The parties burn a lot of pages talking about the nuances of various ordinances. But at the end of the day, the claim is simple. National Experiential alleges that the City picked Speaker A instead of Speaker B based on the content of the message. That's a claim.

The City contends that it did not pick one speaker over another based on the content of the message. As the City sees things, National Experiential's laser-light projection was a "sign" under the ordinance, but the color red was not. So, the City believes that it applied the ordinance without focusing on the message. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) (concluding that billboard-regulating ordinance that allowed some signs and not others was not unconstitutional); *Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 623 (6th Cir. 2009) (concluding that regulations for signs based on aesthetic and traffic concerns did not violate the Constitution); *Covenant Media Of SC, LLC v. City Of N. Charleston*, 493 F.3d 421, 435 (4th Cir. 2007) (concluding that imposing non-message-related rules about signs is constitutional).

Even if the red lighting was a "sign," the City points out that National Experiential is challenging an ordinance (MCC § 17-12-0804-A) that distinguished between "dynamic image displays" and other types of signs. *See* MCC § 17-12-0804-A ("*Dynamic image display sign features and electronic elements are prohibited.*") (emphasis in original). National Experiential's project was a "dynamic image display," and the red lighting was not. So, maybe the ordinances banned National Experiential's display, but did not ban lighting up the skyscraper in red.

At bottom, that argument goes to why the City did what it did. And that's a question for discovery. If the City did not choose one display over another based on the content, then the

31

City can make that argument at the summary judgment stage. But for now, the complaint says enough to live to fight another day.

*     *     *

In sum, the Court grants the motions to dismiss Count I filed by MB, the CSC, and Bachman. The Court denies the City's motion to dismiss Count I.

### C. Facial Challenge to Section 0504 (Count II)

Count II is a facial attack on section 0504 of the municipal code. *See* Am. Cplt., at ¶¶ 60–66 (Dckt. No. 72). Specifically, National Experiential alleges that section 0504 unconstitutionally differentiates between commercial speech and artistic speech. *Id.* at ¶ 61.

Like the allegations in Count I, the allegations in Count II are shrouded in mystery. For the most part, National Experiential seems to contend in Count II that the ordinance creates an impermissible distinction between commercial and artistic speech – a partial repeat of allegations from Count I. *Id.* at ¶¶ 61–63. But National Experiential also makes a passing reference to the overbreadth doctrine. *Id.* at ¶ 65. And to excessive discretion. *Id.* at ¶ 66.

If Count II has a familiar ring after reading Count I, you're not alone.

The Court reads both Counts I and II as alleging that section 0504 unlawfully differentiates between commercial and artistic speech. *Compare id.* at ¶¶ 50–54 (Count I) (alleging that section 0504 unconstitutionally regulates commercial speech but exempts artistic speech), *with id.* at ¶¶ 61–66 (Count II) (asserting that the zoning ordinance is unconstitutional because it exempts artistic speech).

Once again, the murky, shape-shifting quality to the allegations makes it difficult for the City (and the Court) to pin down National Experiential's claims. *See* 3/9/22 Mem. Opin. & Order, at 17 (Dckt. No. 68). Once again, the Court will lean on National Experiential's brief,

32

which seems to solely focus on the ordinance's exemption for artistic works. *See* Pl.'s Joint Resp., at 5–8 (Dckt. No. 85).

This Court already addressed National Experiential's facial attack on section 0504 in Count I. Alleging the same thing in Count II does not move the ball forward.

The City doesn't argue that Counts I and II are duplicative. *Cf.* Def. City of Chicago's Mem., at 6–9 (Dckt. No. 77) (not discussing Counts I and II as duplicative). The City seemed to leave some meat on the table.

There is no need for two counts that allege the same thing. Repetition creates confusion, imposes additional costs, and contributes nothing except girth. "Courts have authority to dismiss duplicative claims if they allege the same facts and the same injury." *Barrow v. Blouin*, 38 F. Supp. 3d 916, 920 (N.D. Ill. 2014) (Dow, J.); *see also Tapia v. City of Chicago*, 2019 WL 3716915, at *7 (N.D. Ill. 2019) (Durkin, J.) ("Courts have authority to dismiss claims as duplicative where the parties, claims, facts and requested relief are substantially the same.") (cleaned up).

"Claims that involve the same operative facts and same injury, and that require proof of essentially the same elements, are duplicative as opposed to alternative." *Barrow*, 38 F. Supp. 3d at 920; *see also Dahlin v. Jenner & Block, LLC*, 2001 WL 855419, at *10 (N.D. Ill. 2001) (dismissing as duplicative counts that merely "mirror" each other).

As far as this Court can tell, Count II repeats a big part of Count I. Each claim raises a facial challenge to section 0504. That's unnecessary. Count II is dismissed because it is duplicative of Count I.[4]

---

[4] If National Experiential intended to bring a different claim in Count II, National Experiential can file a motion.

### D. As-Applied Challenge to Section 0504 (Count III)

As the Court understands it, Count III is an as-applied challenge to section 0504. *See* Am. Cplt., at ¶¶ 68–70 (Dckt. No. 72). National Experiential seems to allege that the City allowed other temporary illuminated signs without a permit, even though those signs constituted commercial speech. *See* Pl.'s Joint Resp., at 9 (Dckt. No. 85).[5]

Specifically, National Experiential pleaded that the Merchandise Mart features temporary illuminated signs that promoted the names of artists and exhibits. *See* Am. Cplt., at 14–15 (Dckt. No. 72).

For out-of-towners, the Merchandise Mart is a large, privately owned commercial building – it spans two city blocks and 4.2 million gross square feet – located on the riverfront in downtown Chicago. *See About*, The Mart, https://www.themart.com/about/ (last visited August 9, 2024). Built in the 1930s in an Art Deco style, the Merchandise Mart is a fixture of downtown Chicago. *Id.*

From April through December each year, the Merchandise Mart plays host to a nightly event, Art on the Mart. *See About*, Art on the Mart, https://artonthemart.com/about (last visited

---

[5] Count III, like Counts I and II, reads like a mishmash of First Amendment-related language. In one paragraph, National Experiential contends that Millennium Park is a public forum, and that its claim is therefore entitled to strict scrutiny. *See* Am. Cplt., at ¶ 70 (Dckt. No. 72). The City thinks that the speech itself was the *projections* onto two privately owned buildings (the Aon Center and Prudential Building), which are not public forums. *See* Def. City of Chicago's Mem., at 9 (Dckt. No. 77). In the City's view, the fact that the *projector* was set up in Millennium Park (a public forum) is irrelevant. *Id.* National Experiential does not respond to the City's argument. *Cf.* Pl.'s Joint Resp. (Dckt. No. 85) (not discussing whether the speech was made in a public forum). National Experiential has waived any response. *See, e.g., Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) (opining that a "party generally forfeits an argument or issue not raised in response to a motion to dismiss"); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) ("Because [the plaintiff] did not provide the district court with any basis to decide [his] claims, and did not respond to the [defendants'] arguments, these claims are waived."). In any event, an allegation about Millennium Park as a public forum does not seem to fit with the other allegation advanced by National Experiential in Count III – *i.e.*, that the City treated it differently from others who engaged in mixed commercial and artistic speech. Because National Experiential's brief does not mention the public forum argument, the Court assumes that the company is not making that argument anymore.

August 9, 2024).  "A shining example of Chicago's long-standing commitment to public art, ART on THE MART brings cutting-edge video mapping techniques to Chicago's Riverwalk, displaying projections of contemporary art across the 2.5-acre façade of THE MART."  *Id.*

The complaint states that the City "routinely allows illuminated projection on the Merchandise Mart of messages which have both commercial and artistic components and objectives."  *See* Am. Cplt., at ¶ 69 (Dckt. No. 72).  The complaint includes photographs of the Merchandise Mart illuminated with the names of artists and their exhibits.  *Id.* at 14.

The City contends that messaging about art exhibits does not count as commercial.  *See* Def. City of Chicago's Mem., at 10 n.2 (Dckt. No. 77).

National Experiential disagrees.  It thinks that "the commercial message is plain to see" and that "advertising of [] artists' names and work is commercial speech."  *See* Pl.'s Joint Resp., at 9 (Dckt. No. 85).

Both parties' arguments are one paragraph long and do not cite case law.  *Compare* Def. City of Chicago's Mem., at 10, *with* Pl.'s Joint Resp. to Mtns. to Dismiss, at 9 (Dckt. No. 85). Failure to cite case law, or other authority, can result in waiver.  *See, e.g.*, *White*, 8 F.4th at 552 ("[A]rguments that are unsupported by pertinent authority[] are waived."); *NRRM, LLC v. Mepco Fin. Corp.*, 2013 WL 4537391, at *4 (N.D. Ill. 2013) (concluding that waiver occurred because party "offer[ed] no substantive response, and cite[d] no case law or other authority").

The parties did not do enough to put the ball in play.  Nevertheless, the Court conducted its own research.

The Supreme Court addressed what qualifies as commercial speech in *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60 (1983).  The Seventh Circuit has read *Bolger* as "suggesting certain guideposts for classifying speech that contains both commercial and noncommercial

35

elements; relevant considerations include whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 517 (7th Cir. 2014) (citations omitted). However, the Seventh Circuit has cautioned that "[t]his is just a general framework" – and none of the factors is "sufficient" or "necessary." *Id.*

The speech in question here – *i.e.*, the messages about Art on the Mart exhibits – seems to satisfy at least two of the *Bolger* criteria. To wit, a message about an upcoming art exhibit seems like advertising. The messages refer to specific products – they mention artists and exhibits by name. And while Art on the Mart is free to view, the Court is not sure, at this stage of the litigation, whether economic motivation might come into play.[6]

Based on *Bolger*, National Experiential has plausibly pleaded that the City treated its speech differently than other commercial speech. In light of the cursory briefing, the Court declines to dismiss Count III.

### E.      Excessive Discretion (Count IV)

Count IV is a facial challenge and an as-applied challenge to the ordinance. National Experiential alleges that MCC § 17-12-0804-E vests excessive discretion in the Zoning Administrator. *See* Am. Cplt., at ¶¶ 71–76 (Dckt. No. 72).

To recap, section 0804-E deals with the Zoning Administrator's discretion to issue permits for special event signs. More specifically, the ordinance says that "[t]he Zoning Administrator is authorized to issue temporary sign permits for special event signs and to impose time limits and other restrictions on the use, location, dimensions and characteristics of such

---

[6] One wonders if the line between art and commerce is more than a little hazy, especially on the margins. Ask anyone who has ever been to an art fair. Art is big business, and art galleries tend to accept green cash money.

signs[.]" *Id.* at ¶ 73.

The City argues that National Experiential lacks standing to challenge this provision, and that the challenge fails on the merits. *See* Def. City of Chicago's Mem., at 10–12 (Dckt. No. 77). The Court will address standing first (as it must), before turning to the merits.

### 1. Article III Standing

The City thinks that National Experiential lacks Article III standing to challenge section 0804-E. *See id.* at 11. The City points out that "Plaintiff does not allege that it actually applied for a permit under that section . . . ." *See* Def. City of Chicago's Reply, at 9 (Dckt. No. 87).

Taking a step back, the Constitution vests federal courts with judicial power in "Cases" and "Controversies." *See* U.S. Const. art. III, § 2. That bedrock requirement has several layers of meaning. At bottom, a federal court can decide a case only if there is a real dispute brought by a person who suffered an injury. Standing to sue is the first step.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *See Warth v. Seldin*, 422 U.S. 490, 498 (1975). Standing is "not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787." *See Valley Forge Christian College v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 476 (1982).

Standing "requires the litigant to prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

37

By the look of things, the foothold for standing in the First Amendment context seems wider than the foothold in other contexts. There's more space, and the range of cognizable injuries seems wider. In First Amendment cases, the Supreme Court has crafted a rather generous foothold for standing. *See* 15 James Wm. Moore, *et al.*, Moore's Federal Practice § 101.61[5][a] (3d ed. 2024) ("Within the First Amendment context, courts properly apply an expanded notion of standing to determine who may institute the asserted claim for relief.").

The wider landing spot for standing shows up in cases that challenge licensing statutes. A challenge to a discretionary permitting process "does not involve the conventional standing requirements." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1043 (7th Cir. 2002).

"[I]t is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988) (quoting *Freedman v. Maryland*, 380 U.S. 51, 56 (1965)); *see also Thornhill v. Alabama*, 310 U.S. 88, 97 (1940) ("Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas.").

The rule is rooted in the value of robust discussion, and the need to avoid a chilling effect. "This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992).

The idea is that the "mere existence" of "unfettered discretion" might silence someone, even if the state never actually wields the "discretion" and abuses its "power." *See Lakewood*, 486 U.S. at 757.

The landing for standing is broader in the First Amendment context, but it is not so broad that it covers hypothetical harms. The Supreme Court has not given the green light to anyone and everyone to challenge a licensing statute. Instead, "the plaintiff must have some intention of speaking or otherwise exposing himself or herself to the vagaries of the challenged licensing scheme; a chilling effect on the speech of others is insufficient to establish standing."[7]  *See* 15 James Wm. Moore, *et al.*, Moore's Federal Practice § 101.61[5][b][ii] (3d ed. 2024).

"Virtually by definition, the threat of self-censorship cannot exist if a party has no intention either of speaking or otherwise exposing herself to the vagaries of a standardless licensing policy." *See Osediacz v. City of Cranston*, 414 F.3d 136, 142 (1st Cir. 2005). "[T]he party mounting a facial challenge" must have "desired or intended to undertake activity within the compass of the challenged statute." *Id.* And the party's activity must be within the statute's reach. *See Stokes v. City of Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991) ("The class of plaintiffs eligible for standing includes all who are *affected by its implementation*. Here, that includes all who must apply for a permit, since they suffer the vagaries of discretion[.]") (emphasis added).

A failure to apply for a permit isn't an automatic reason to deny standing. But on the flipside, a plaintiff doesn't have standing if that person never intended to apply for a permit and never intended to do the activity covered by the permit. Without an intent to apply and engage in the covered conduct, that person suffered no harm from a denial that never happened. Otherwise, anybody and everybody would have standing.

---

[7]  The last part of that sentence (after the semicolon) seems overbroad. But it can't be read in isolation. It must be read in connection with the first part of the sentence. A chilling effect is insufficient if the person had no intention of applying for a permit and engaging in the covered activity in the first place.

It would be one thing if a person would have applied, and would have engaged in the conduct covered by the permit, but chose not to apply because the denial was a foregone conclusion. If a denial was inevitable, there is less reason to think that a person should have to go through the motions to get the bad news. A person could suffer harm through a chilling effect, by foregoing action that the person would have taken but for the problematic government decision-making. *See Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016) ("[The plaintiff] alleged that, but for the ordinances, it would have engaged in protected speech[.]"); *cf. Weinberg*, 310 F.3d at 1043 (concluding that a plaintiff had standing to bring a facial challenge even though he did not apply for a license because "*he will* suffer the vagaries of discretion") (cleaned up; emphasis added).

But that rationale seems to break down when the person had no intention of seeking a permit and engaging in the activity in the first place. In that scenario, a claim that challenges the government's discretion seems like an afterthought, when the person suffered no actual harm in the real world. The chilling effect rationale doesn't apply when the person felt no chill.

Based on the precedent, a plaintiff can challenge a permitting scheme based on excessive government discretion without first applying for a permit. *See Nationalist Movement*, 505 U.S. at 129–30; *see also Weinberg*, 310 F.3d at 1043; *Peterson v. Vill. of Downers Grove*, 150 F. Supp. 3d 910, 933 (N.D. Ill. 2015). The government doesn't need to drop the hammer for a plaintiff to have standing. But the plaintiff must have intended to seek a permit and engage in the covered activity, and must have foregone an application because of the inevitable denial from excessive government discretion.

National Experiential brings a facial and as-applied challenge to section 0804-E. *See* Am. Cplt., at ¶ 72 (Dckt. No. 72). The company has standing to bring both challenges.

National Experiential has standing to bring a facial challenge to the ordinance. *See City of Lakewood*, 486 U.S. at 758; *see also Freedman*, 380 U.S. at 57. National Experiential wanted to engage in a certain activity (the light show), and the City used the ordinance to reject the plan.

National Experiential alleges that the City thought that the licensing scheme applied to National Experiential's plan. *See* Am. Cplt., at ¶ 46 (Dckt. No. 72) (alleging that the City "claimed" that the "Chicago Municipal Code of Chicago . . . specifically . . . § 17-12-0804-E required a zoning permit"). So National Experiential was under the thumb of the ordinance that it now challenges. *See Nationalist Movement*, 505 U.S. at 129; *see also Van Wagner Boston, LLC v. Davey*, 770 F.3d 33, 42 (1st Cir. 2014) ("Van Wagner has plausibly alleged that it is subject to a regulatory permitting scheme that chills protected expression by granting a state official unbridled discretion over the licensing of its expressive conduct. It follows – as night follows day – that Van Wagner has standing to mount a facial challenge to that regulatory permitting scheme."); *cf. Adams Outdoor Advert. Ltd. P'ship v. City of Madison*, 2020 WL 1689705, at *4 (W.D. Wis. 2020) (holding that a plaintiff did not have standing to bring a claim involving an ordinance that didn't "apply to it" or "relate to its business").

National Experiential has standing to bring an as-applied challenge, too. *See Six Star Holdings*, 821 F.3d at 802–03 (opining that the distinction between facial and as-applied challenges had "little force" when determining plaintiff's standing to challenge an ordinance); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

41

The complaint suggests that National Experiential had some interest in getting the permit, during the last-minute rush to keep its plans alive. The complaint implies that, after the City flip-flopped and said that National Experiential *did* need a permit, National Experiential had discussions with the Zoning Administrator about getting one.

On February 14, 2020, Zoning Administrator Murphey emailed National Experiential about the permit. He expressed his "inability or unwillingness" to "use his discretion" to "authorize" a permit for National Experiential under the statute. *See* Am. Cplt., at ¶ 76 (Dckt. No. 72); *id.* at ¶ 32 (stating that Murphey "advised Plaintiff's counsel that 'this has evolved into a much larger issue that appears to go well beyond zoning,' but that he was happy to continue discussions regarding the projections"). In other words, the complaint alleges that the Zoning Administrator trotted out the ordinance, and used it against National Experiential.

National Experiential has standing to bring an as-applied challenge to the amount of discretion given to the zoning official, even though it never applied for a permit. *See Six Star Holdings*, 821 F.3d at 801 (concluding that the plaintiff had standing to bring an as-applied challenge to an ordinance despite never seeking a license); *Andree v. Ashland Cnty.*, 818 F.2d 1306, 1310 n.6 (7th Cir. 1987) ("[W]e do not believe that the failure of plaintiffs to apply for a license under the statute deprives them of their standing [to bring an as-applied challenge] . . . ."); *Real v. City of Long Beach*, 852 F.3d 929, 935 (9th Cir. 2017).

So, the Court concludes that National Experiential has standing to bring both facial and as-applied challenges to section 0804-E. Onto the merits.

### 2. The Zoning Administrator's Discretion on the Merits

"Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content."

*Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002). Thus, the Supreme Court requires regulations to "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id.* "Standards are adequate if they are 'narrow, objective, and definite.'" *GEFT Outdoor, LLC v. Monroe Cnty.*, 62 F.4th 321, 326 (7th Cir. 2023) (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)).

The challenged provision states that "[t]he Zoning Administrator is authorized to issue *temporary sign* permits for special event *signs* and to impose time limits and other restrictions on the use, location, dimensions and characteristics of such *signs* to ensure that they are consistent with the purposes of this chapter." *See* MCC § 17-12-0804-E (emphasis in original).

National Experiential contends that, on its face, section 0804-E provides subjective criteria that the "Zoning Administrator may use, possibly in pretext or arbitrarily [sic] regulation of protected speech, making it very difficult for persons to conform to the law." *See* Am. Cplt., at ¶ 74 (Dckt. No. 72). As applied, National Experiential contends that Zoning Administrator Patrick Murphey was either unable or unwilling "to use his discretion to authorize the Plaintiff's sign permit as provided in § 0804-E." *Id.* at ¶ 76.

The Court will look at the facial challenge, and then the as-applied challenge.

### i.    Facial Challenge

"Although facial challenges to legislation are generally disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990).

To be sure, the challenged provision does vest discretion in the Zoning Administrator. But the discretion is not unfettered. The ordinance narrows the discretion.

Section 0804-E directs the Zoning Administrator to impose restrictions to comply "with the purposes of this chapter," meaning Chapter 17-12 of Chicago's municipal code. *See* MCC § 17-12-0804-E. The chapter – titled "Signs" – has specific regulations for temporary signage, such as requirements about lighting and size. *See, e.g.*, MCC § 17-12-0803; MCC § 17-12-0804.

The chapter defines its "Purpose," too. "The *sign* regulations of this chapter are intended to balance the public interest – in promoting a safe, well-maintained and attractive city – with the interests of businesses, organizations and individuals in ensuring the ability to identify and advertise products, services and ideas, and with the interests of the city and other units of government in communicating public service and emergency messages on a city-wide basis in a coordinated and timely manner through an integrated network of city digital signs." *See* MCC § 17-12-0101 (emphasis in original).

"While these standards are undoubtedly flexible, and the officials implementing them will exercise considerable discretion, perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Rock Against Racism*, 491 U.S. at 794; *see also MacDonald v. City of Chicago*, 243 F.3d 1021, 1029 (7th Cir. 2001) (holding that ordinance giving city official discretion about parade permitting survived facial challenge because even though "city officials [had] flexibility in assessing the proposed activity, the flexibility is no more than is necessary so as to allow the city officials to balance the competing interests at issue").

So, the Court concludes that a facial challenge cannot get off the ground. The ordinance in question does vest the official with considerable discretion. But the ordinance includes animating principles that provide guideposts for the exercise of that discretion. The First Amendment does not require greater granularity. Identifying high-level principles to guide that

discretion is enough. *See, e.g.*, *GEFT Outdoor*, 62 F.4th at 329 (concluding that discretion within zoning scheme was permissible where, like here, the "procedures only come into play when someone wants to install a sign that violates some substantive standard"); *Thomas*, 534 U.S. at 325 (concluding that retaining some discretion to deny permits "further[ed], rather than constrict[ed], free speech" on balance); *Blue Canary Corp. v. City of Milwaukee*, 270 F.3d 1156, 1158 (7th Cir. 2001) (holding that zoning commissioner's discretion was permissible and stating that "some degree of discretion is an unavoidable feature of law enforcement").

### ii.      As-Applied Challenge

The as-applied challenge is up to bat next.  For starters, the City contends that National Experiential cannot challenge section 0804-E because that provision did not apply to National Experiential's planned projection.  *See* Def. City of Chicago's Mem., at 10–12 (Dckt. No. 77).  That is, in the City's view, National Experiential's planned light display was not a "special event sign" within the meaning of section 0804-E.  *Id.* at 11.

The City seems to walk back this argument in its reply brief, where it concedes that "[p]erhaps the City could have opted to treat Plaintiff's proposed projection as a special event sign under that section, reading the provision broadly to encompass any sign relating to the special event at issue – the NBA All Star Weekend."  *See* Def. City of Chicago's Reply, at 10 (Dckt. No. 87).

The Court accepts the City's concession.  The details of the City's permitting process are sketchy at this stage of the proceedings.  The City *might* have broadly defined its ordinance to encompass the planned projection.  Or it might not have.  The Court cannot tell, either way.

The City has another argument about why National Experiential's as-applied challenge fails:  "the use of illumination and dynamic image displays in temporary signs is prohibited by

MCC § 17-12-804A." *Id.*  That is, the City contends that the Zoning Administrator's discretion was irrelevant to National Experiential's plans because National Experiential's project expressly violated a city ordinance.  Under that provision, "*Temporary signs* may not be illuminated. *Changing-image sign* features and electronic elements are prohibited."  *See* MCC § 17-12-0804-A (emphasis in original).

Candidly, at this point, the Court needs more.  The Court needs to hear the facts about why Murphey did what he did.  And the Court needs to better understand from the parties the scope of his discretion.  The parties need to pin down whether he had the authority to issue a permit, even if the proposed display violated a City ordinance.

So, for now, the Court will let Count IV roll forward to the extent that National Experiential is bringing an as-applied challenge.

## II.  Breach of Contract Claim (Count V)

The next claim is a breach-of-contract claim against the City.  *See* Am. Cplt., at ¶¶ 77–94 (Dckt. No. 72).

National Experiential acknowledges that the contract gave the City express permission to cancel.  "This license agreement is revocable and may be terminated by the City at any time and for any reason."  *See* License Agreement, at ¶ 8 (Dckt. No. 34-1, at 5 of 17).  That's a pretty big roadblock.

Even so, the complaint offers three reasons why the City allegedly breached the contract. *See* Am. Cplt., at ¶¶ 77–94 (Dckt. No. 72); *see also* Pl.'s Joint Resp., at 11–12 (Dckt. No. 85). First, National Experiential contends that the License Agreement was unconscionable.  Second, it argues that the City acted in bad faith.  Finally, it argues that the contract defined the projection as a "permitted use," which, in its view, means that no permit was needed.

The Court takes up each argument in that order.

## A. Unconscionability

The Court begins with unconscionability. All too often, the fact that a party raises unconscionability is a sure-fire sign that the party has no good argument. It's the last gasp of a losing position that is on its last legs. Especially when the party is sophisticated. It is like throwing a Hail Mary pass without having a receiver downfield.

National Experiential admits that the agreement "gave the City the express contractual right to cancel the Agreement at any time for any reason." *See* Am. Cplt., at ¶ 89 (Dckt. No. 72). Still, the complaint alleges that the agreement was "substantially unfair and unconscionable relative to the parties' assumed obligations." *Id.* at ¶ 91.

The City argues that the cancellation provision was not unconscionable. *See* Def. City of Chicago's Mem., at 12 (Dckt. No. 77). And in the response brief, National Experiential did not defend its claim about unconscionability. *See* Pl.'s Joint Resp., at 11–14 (Dckt. No. 85). It dropped the point, so it is waived. *See, e.g.*, *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (explaining that an argument is waived when the "litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss"); *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.").

Even so, the claim about unconscionability was going nowhere fast.

"An unconscionable bargain is one which no reasonable person would make and which no honest person would accept. . . . The term 'unconscionable' encompasses the absence of

meaningful choice by one of the parties as well as contract terms which are unreasonably favorable to the other party." *Zubi v. Acceptance Indem. Ins. Co.*, 751 N.E.2d 69, 78 (Ill. App. Ct. 2001) (quoting *Learned v. First Chicago Corp.*, 636 N.E.2d 1004, 1006 (Ill. App. Ct. 1994)).

"A contract term can be invalidated on the basis of 'substantive' unconscionability, 'procedural' unconscionability, or a combination of both." *Zuniga v. Major League Baseball*, 196 N.E.3d 12, 20 (Ill. App. Ct. 2021). "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006). Substantive unconscionability applies when a contract provision is "inordinately one-sided in one party's favor." *Id.*

The License Agreement gave the City sweeping rights to revoke the agreement – "at any time and for any reason." *See* License Agreement, at ¶ 12 (Dckt. No. 34-1, at 5 of 17). The cancellation provision was not buried in the contract, or in microscopic font. It appeared on the second page of the contract – right before the signature line – with a heading reading: "**Cancellation by City**." *Id.* By contrast, National Experiential could only cancel with 45 days written notice – and even then, it would lose 50% of the space rental fee. *Id.* at ¶ 5.

Illinois law allows parties to enter into contracts where only one of the parties has a right to cancel. "[C]ontractual language, that on its face, gives one or the other of the parties an unbridled right to cancel or terminate the contract must, if possible, be construed so as to sustain the validity of the contract in question." *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 194 (Ill. App. Ct. 2004).

To be sure, the contract gave the City more favorable cancellation rights than National Experiential. That's perfectly fine. Contracting parties can agree to give one side lopsided

rights. It doesn't have to be a level playing field. Courts are not in the business of leveling things out.

National Experiential – a marketing company that landed a major contract with Nike – was a sophisticated party. Plus, it had notice of the cancellation provision, which appeared prominently in the contract. *See, e.g.*, *Martinell v. Navistar Int'l Corp.*, 2012 WL 2503964, at *4 (N.D. Ill. 2012) (concluding that a contractual term wasn't unconscionable since the terms were "clearly written" and the contracting party was "sophisticated").

"Although the cancellation provision of the policy was certainly more favorable" to the City, it was not "a bargain that no reasonable person would make and which no honest person would accept." *Zubi*, 751 N.E.2d at 78. The contract was lopsided, but National Experiential agreed to it anyway. It accepted the risk of cancellation by the City.

In sum, National Experiential cannot challenge the agreement based on unconscionability. And it dropped that part of the claim anyway, by failing to respond.

**B.    Bad Faith**

The next challenge involves the implied covenant of good faith and fair dealing. National Experiential contends that the City acted in bad faith. *See* Am Cplt., at ¶ 92 (Dckt. No. 72); *see also* Pl.'s Joint Resp., at 12 (Dckt. No. 85).

Like unconscionability, "bad faith" often comes up when a party feels like they got a raw deal. But amorphous assertions of unfairness are not a basis for invoking the implied covenant of good faith. Life is unfair – and sometimes the other party to the contract is unfair too.

"Every contract contains an implied covenant of good faith and fair dealing." *McCleary v. Wells Fargo Sec., LLC*, 29 N.E.3d 1087, 1093 (Ill. App. Ct. 2015). "This implied duty is

based on fundamental notions of fairness." *See* E. Allan Farnsworth & Zachary Wolfe, Farnsworth on Contracts § 7-20 (4th ed. 2024).

Parties are presumed to act in good faith. "[T]here is a presumption that all parties act in good faith." *See* 23 Williston on Contracts § 63:22 (4th ed. 2023). In Illinois, breach of the covenant can give rise to a breach-of-contract claim, but it is not independently actionable. *See McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013) (applying Illinois law).

That is, a claim about the implied covenant of good faith cannot stand on its own two feet, separate and apart from the contract. There is no free-floating duty to be fair, even with a party's contracting partners. *See Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987) ("The element of good faith dealing implied in a contract 'is not an enforceable legal duty to be nice or to behave decently in a general way.' It is not a version of the Golden Rule, to regard the interests of one's contracting partner the same way you regard your own.") (citation omitted); *Shed v. Bredemann*, 2024 WL 1637544, at *3 (7th Cir. 2024) ("Under Illinois law, breach of the implied covenant is not a standalone cause of action to remedy the poor behavior of a contracting party.").

The implied covenant of good faith is a lens that courts use to interpret the language of a contract. *See In re Kmart Corp.*, 434 F.3d 536, 542 (7th Cir. 2006). "[T]his covenant serves to guide construction of explicit terms of the agreement, particularly when gaps exist in the contract." *See First Bank & Trust v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 325 n.10 (7th Cir. 2001); *see also Wilson v. Career Educ. Corp.*, 729 F.3d 665, 675 (7th Cir. 2013) ("[T]he implied covenant of good faith is used as a construction aid to assist the Court in determining whether the manner in which one party exercised its discretion under the contract violated the reasonable expectations of the parties when they entered into the contract.").

To plead a breach of the implied covenant of good faith and fair dealing, a plaintiff must first prove the existence of contractual discretion. *See McCleary*, 29 N.E.3d at 1093. "The purpose of this duty 'is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.'" *Id.* (citation omitted).

A party violates the implied covenant of good faith by exploiting contractual discretion and taking action that the parties could not have anticipated at the time of contract formation. *See Eckhardt v. Idea Factory, LLC*, 193 N.E.3d 182, 194 (Ill. App. Ct. 2021); *RBS Citizens, N.A. v. Sanyou Imp., Inc.*, 525 F. App'x 495, 499 (7th Cir. 2013); *see also* 23 Williston on Contracts § 63:22 (4th ed. 2023) ("A breach of the implied obligation of good faith and fair dealing is obviously present where a party acts in bad faith, but it may also be found where the defendant acts in a commercially unreasonable manner while exercising some discretionary power under the contract.").

"Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *See Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 916 (Ill. App. Ct. 2004) (internal quotation marks omitted).

"The implied covenant of good faith and fair dealing does not require a party with discretion to forbear from exercising its right to terminate a contract for the benefit of the other party to the agreement." *Id.* "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of

'good faith.'"  *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990).

National Experiential asserts that "Chicago alleged it terminated the contract solely because Plaintiff had failed to obtain a temporary lighting permit . . . ."  *See* Am. Cplt., at ¶ 85 (Dckt. No. 72).  The parties agree that the contract granted the City discretion to cancel the contract.  But they disagree about whether the City exercised its discretion properly.

For its part, National Experiential asserts that the City told it that the plans did not require a permit.  *See* Pl.'s Joint Resp. to Mtns. to Dismiss, at 12 (Dckt. No. 85).  The company claims that the City "knew what Plaintiff was going to do," and "led Plaintiff to believe that it had proper authority to move forward with the projection" until it pulled the plug two days before the project.  *Id.*

In the City's view, National Experiential's license required it "to obtain all necessary permits and to refrain from doing anything that would violate City regulations."  *See* Def. City of Chicago's Reply, at 10–11 (Dckt. No. 87).  While the City concedes that "the allegations indicate some confusion as to whether a permit would, in fact, have been granted . . . the fact remains that no permit was sought or obtained, and that, in any event, the proposed projection was fatally non-complaint with MCC § 17-12-804A," meaning the ordinance prohibiting illuminated temporary signs, changing-image sign features, and electronic elements.  *Id.* at 11.

In an attachment to the License Agreement called "License Agreement General Conditions – All Events," a heading titled "**Regulations**" appears.  *See* License Agreement General Conditions, at ¶ 11 (Dckt. No. 34-1, at 8 of 17) (emphasis in original).  That heading includes language that speaks to regulatory requirements, including other permits and licenses that may be required.  *Id.*

52

"Licensee shall obtain and pay for all necessary permits and licenses, if any, required for the entertainment or activity being presented, and shall not do anything on the premises in violation of any laws, ordinances, rules or requirements, and if the attention of the Licensee is called to any such violation, the Licensee shall immediately desist from or correct such violation." *Id.* A representative from National Experiential signed the "General Conditions" form (a document attached to the License Agreement). *See id.* (Dckt. No. 34-1, at 16 of 17).

To be sure, National Experiential alleges that, in December 2019, Jonathon Scott of MB sent the company an email stating that the City believed that a permit would not be required. *See* Am. Cplt., at ¶¶ 10, 31 (Dckt. No. 72). Scott specifically told National Experiential that it didn't need to complete a "Special Event Permit Application." *Id.* at ¶ 10.

As it turns out, a "special event permit" (*i.e.*, the permit that Scott said National Experiential did not need) is a different permit than a "temporary sign permit" (*i.e.*, the permit at the heart of this litigation). *Compare* MCC § 10-8-33(b) ("No person shall conduct a special event unless the sponsor of the event obtains a special event permit from the Department."), *with* MCC § 17-12-0804 (discussing temporary signs).

National Experiential does not assert that the City ever told it that no *temporary sign* permit was needed. The complaint does not allege that the City ever told National Experiential directly that a permit wasn't required.

The City did not have an affirmative duty, under the agreement, to ensure that National Experiential obtained any necessary permits or licenses. That duty rested on National Experiential. *Cf.* License Agreement General Conditions, at ¶ 11 (Dckt. No. 34-1, at 8 of 17) (placing the duty on National Experiential to "obtain and pay for all necessary permits and licenses, if any").

At the end of the day, the City had broad discretion to cancel the contract. The license required National Experiential to comply with City regulations. *See* License Agreement General Conditions, at ¶ 11 (Dckt. No. 34-1, at 8 of 17). The planned light display violated a municipal ordinance. *See* MCC § 17-12-0804-A. And National Experiential did not have a permit.[8]

The provision in question vested the City with the express contractual right to cancel the project, for any reason. The parties did not place any limits on the City's discretion. Quite the opposite – the discretion was boundless. The implied covenant of good faith does not transform a right to cancel into a right to cancel "only if you have a good reason."

National Experiential voluntarily accepted the contract and exposed itself to the risk of a last-minute cancellation. And as it turned out, the City cancelled at the last minute (give or take). Pulling the plug on the project was not outside the realm of possibility when the parties entered into the contract. If anything, it was exactly the type of thing that National Experiential could have seen coming a mile away.

The City did not exploit its discretion in an unanticipated way. The City exercised its discretion as the parties expressly agreed that it could. So the City did not violate the implied covenant of good faith when it cancelled the contract.

## C.    Permitted Use

Next, National Experiential argues that "[a]n additional basis to the [sic] support the breach of contract [claim] stems from an express provision in the agreement; namely, the fact

---

[8]  The Court reads the complaint as alleging that the City terminated the contract only because of the lack of zoning permit, not for any other reason. *See* Am. Cplt., at ¶¶ 85, 92 (Dckt. No. 72). The argument also runs into trouble to the extent that National Experiential is arguing that the City gave a pretextual reason for the cancellation (*i.e.*, that it pointed to the lack of a permit when, in reality, it wanted the building lit in red for the Bulls). *See* 3/9/22 Mem. Opin. & Order, at 19 (Dckt. No. 68) ("Maybe the City did the bidding of the CSC, and ended the deal with National Experiential so that the CSC could get its way and gaze at a bright-red Prudential Building. That's not a breach of contract.").

54

that the projection is described by the City in the contract as a 'Permitted Use.'" *See* Pl.'s Joint Resp. to Mtns. to Dismiss, at 13 (Dckt. No. 85).

The bolded words "**Permitted Use**" come before the very first paragraph in the contract. *See* License Agreement, at ¶ 1 (Dckt. No. 34-1, at 4 of 17). "City grants Licensee a license to use the spaces in Millennium Park . . . during the periods set forth herein for the following performance/event and for no other purpose: **Nike Light Promo for NBA All-Star Game**." *Id.* (emphasis in original).

According to National Experiential, "'Permitted Use' when capitalized is a legal zoning term of art used uniformly throughout the U.S. and to which the Chicago Zoning Code definition conforms." *See* Am. Cplt., at ¶ 19 (Dckt. No. 72). Chicago's Municipal Code defines "Permitted Use" as "[a] use permitted by-right in the subject zoning district in accordance with the applicable use regulations of this Zoning Ordinance." *See* MCC § 17-17-02119.

According to the complaint, "by-right" means that "no zoning approval is required." *See* Am. Cplt., at ¶ 21 (Dckt. No. 72). "Applicable use regulations" "includes the regulations on temporary illuminated signage." *Id.*

The City thinks that National Experiential construes "permitted use" in a "strange" way. *See* Def. City of Chicago's Reply, at 11 (Dckt. No. 87). In its view, the definition of "permitted use" from the Municipal Code does not apply to the License Agreement, because "zoning districts" "are not at issue here." *Id.*

"Words are to be understood in their ordinary, everyday meanings – unless the context indicates that they bear a technical sense." *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012). "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Right Field Rooftops, LLC v.*

*Chicago Cubs Baseball Club, LLC*, 870 F.3d 682, 690 (7th Cir. 2017) (applying Illinois law); *see also Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) ("A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent.").

 Nothing about the License Agreement suggests that the words "Permitted Use" have a technical meaning. The term "Permitted Use" is not defined within the contract, and the contract does not refer to the Municipal Code. *Cf.* License Agreement (Dckt. No. 34-1, at 4–6 of 17) (not defining "Permitted Use" or citing the Municipal Code).

 While the capitalization of the words "Permitted Use" might imbue meaning in some contexts, the words "**Permitted Use**" appear as a bolded, capitalized header in the License Agreement. *See* License Agreement, at ¶ 1 (Dckt. No. 34-1, at 4 of 17). Other headers are also in all-caps and bold – presumably for formatting reasons. *See, e.g.*, *id.* at ¶ 8 ("**General Conditions**"); *id.* at ¶ 11 "**Processing and Validation**"); *id.* at ¶ 12 ("**Cancellation by City**"); *see also id.* at ¶ 7 ("**Set-up and break down**") (partial capitalization); *id.* at ¶ 10 ("**Staff overtime**") (same).

 So, the Court interprets the words "Permitted Use" in line with their ordinary meaning. In doing so, the Court interprets the term "permitted" to mean "authorized." *See Permit*, Merriam-Webster, https://www.merriam-webster.com/dictionary/permitted (last visited August 9, 2024).

 "Permitted Use" simply identifies the project in question. It means that the project was allowed, meaning that it was authorized by virtue of the License Agreement. "Permitted" means allowed. It does not mean that the party does not need a *permit*. It does not mean that the party has a permit, either.

The "Permitted Use" section of the License Agreement simply defined the project in question. It identified the subject matter of the agreement. That is, the "Permitted Use" was "to use the spaces in Millennium Park . . . for the following performance/event and for no other purpose: **Nike Light Promo for NBA All-Star Game**." *See* License Agreement, at ¶ 1 (Dckt. No. 34-1, at 4 of 17) (emphasis in original). It did not mean that National Experiential did not need a permit.

The Court reads the "Permitted Use" section of the contract as simply defining the scope of the contract's authorization. Specifically, the City was providing National Experiential a license to use space in Millennium Park for one purpose (only): "**Nike Light Promo for NBA All-Star Game**." *See* License Agreement, at ¶ 1 (Dckt. No. 34-1, at 4 of 17) (emphasis in original).

National Experiential's reading would create internal tension in the license agreement, too. The license agreement includes the General Conditions, and the General Conditions say that National Experiential might need a permit. *See* License Agreement, at ¶ 8 (Dckt. No. 34-1, at 4 of 17); General Conditions, at ¶ 11 (Dckt. No. 34-1, at 8 of 17) ("Licensee shall obtain and pay for all necessary permits and licenses, if any, required for the entertainment or activity being presented . . . ."). It would be strange to read "Permitted Use" to mean that there was no need for a permit, when the General Conditions say that National Experiential might need a permit.

In sum, the Court declines to read "Permitted Use" to mean that "no zoning approval is required." Instead, the Court reads the words "Permitted Use" to identify the subject matter of the project. The License Agreement gave National Experiential permission to do a light show from Millennium Park.

The breach-of-contract claim (Count V) is dismissed.

### III. Tortious Interference Claims (Counts VI & VII)

The next two claims involve tortious interference. *See* Am. Cplt., at ¶¶ 95–106 (Dckt. No. 72). The two claims involve two different contracts.

Count VI is against MB, the CSC, and Bachman for tortious interference with the contract between National Experiential and the City. *Id.* at ¶¶ 95–101. That is, the claim is about the License Agreement.

Count VII is against the City for tortious inference with the MacDonald Media contract. *Id.* at ¶¶ 102–06. National Experiential alleges that the City interfered with its contract to do the light display.

Under Illinois law, a tortious interference with contract claim has the following elements: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (citing *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015)); *see also HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 675–76 (Ill. 1989).

The Court will consider Counts VI and VII in that order.

### A. Tortious Interference by MB, the CSC, & Bachman (Count VI)

The Court begins with Count VI, the claim alleging that MB, the CSC, and Bachman interfered with the contract between National Experiential and the City.

As a threshold matter, a tortious interference with contract claim requires an underlying breach of contract. *See Webb*, 906 F.3d at 577.

For the reasons stated in the discussion of Count V, National Experiential has failed to plead that the City breached the contract. MB, the CSC, and Bachman couldn't induce a breach

by the City, when the City did not breach the contract. You can't induce a breach if there is no breach.

So, Count VI must be dismissed. The lack of a breach is a sufficient basis for dismissal.

MB (and only MB) raises another argument for the dismissal of Count VI, too. The Court does not need to reach that argument. But in the interest of completeness, it will.

According to MB, National Experiential failed to plead that MB caused the City to breach the License Agreement. *See* Def. MB's Mem., at 11 (Dckt. No. 80). In other words, MB thinks that National Experiential has failed to plead facts supporting the inducement element.

"Intent to induce requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *Webb*, 906 F.3d at 579 (cleaned up); *see also* Restatement (Second) of Torts § 766 cmt. h (1979) ("The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.").

A plaintiff cannot simply plead that a defendant "created a condition" that opened the door for the breach. *See Brinley Holdings Inc. v. RSH Aviation, Inc.*, 580 F. Supp. 3d 520, 543 (N.D. Ill. 2022). A plaintiff must plead that a defendant *intended* to induce non-performance by the third party. *See Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1156 (N.D. Ill. 2016).

The allegation about MB is conclusory. "After the Millennium Park License Agreement contract was entered, after the City of Chicago had communicated that no permit was needed, and after the City of Chicago had approved the license contract, MB, the CSC and Kara Bachman intentionally and without justification interfered with the Plaintiff's contract with the City of Chicago . . . ." *See* Am. Cplt., at ¶ 98 (Dckt. No. 72). It states that "[t]he City of

59

Chicago, in turn, and as a result of MB, CSC and Kara Bachman's intentional interference with the contract, breached the contract it had with Plaintiff." *Id.* at ¶ 99.

That allegation about MB is a mere legal conclusion, which is not enough to get a claim off the ground. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) ("In reviewing the sufficiency of a complaint under the plausibility standard announced in *Twombly* and *Iqbal*, [the court] accept[s] the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth."); *see also Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014).[9]

The complaint offers no facts suggesting that MB intentionally induced the City to break the License Agreement. If anything, the complaint seems to allege that the CSC encouraged both MB and the City to walk away from the light-display project. *See* Am. Cplt., at ¶ 37 (Dckt. No. 72) ("The CSC exerted pressure behind the scenes with MB and City officials to prevent the performance of the Millennium Park Project beginning at least as early as February 12, 2020.").

So, the complaint alleges that the *CSC* induced the City to cancel the License Agreement. And the complaint sets forth a motive for the CSC's actions, too – *i.e.*, to have the Aon Center

---

[9] In four sentences, MB floats an argument that Rule 9(b)'s heightened pleading standard applies to the tortious interference claims. *See* Def. MB's Mem., at 12 (Dckt. No. 80). Rule 9(b) requires plaintiffs to plead the "who, what, when, where, and how" when they allege fraud. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). MB contends that the complaint alleges a course of fraudulent conduct. *Id.* (citing Am. Cplt., at ¶ 37 (Dckt. No. 72)). However, National Experiential does not allege that Defendants engaged in fraudulent conduct – it contends that the "CSC exerted pressure behind the scenes . . . to prevent the performance of the Millennium Park Project." *See* Am. Cplt., at ¶ 37. Exerting pressure is not fraud. *Cf. Pittsfield Dev., LLC v. Lynd*, 2020 WL 6701104, at *4 (N.D. Ill. 2020) (declining to apply Rule 9(b)'s pleading standard to a tortious interference claim when defendant lobbied city officials to enact a zoning ordinance that interfered with plaintiffs' building project); *Desmond v. Taxi Affiliation Servs. LLC*, 344 F. Supp. 3d 915, 924 (N.D. Ill. 2018) (applying Rule 9(b) to a tortious interference claim involving a "purported scheme to siphon money"); *Diamond Servs. Mgmt. Co. LLC v. C&C Jewelry Mfg., Inc.*, 2022 WL 4466076, at *10 (N.D. Ill. 2022) (same). So, the Court will not apply the Rule 9(b) standard here. But National Experiential fails to plead a tortious interference claim under the Rule 8 standard, so the claim is nonetheless dismissed.

and the Prudential Building lit in Chicago Bulls red, rather than displaying Nike's projections. *Id.* But the complaint does not allege that *MB* induced the City to terminate the License Agreement.

If anything, the complaint suggests that MB was doing the City's bidding – not the other way around. For example, MB employee Micah Lane informed National Experiential that the Millennium Park project was not happening because "the image projects were not approved by appropriate *City of Chicago municipal departments*." *Id.* at ¶ 30 (emphasis added).

Viewed in the light most favorable to National Experiential, the complaint might give rise to an inference that CSC and Bachman encouraged the City to pull the plug on the License Agreement. But National Experiential has failed to plead facts suggesting that MB induced the City to terminate the agreement.

Simply put, the tortious interference claim about the contract with the City cannot get off the ground. The complaint does not allege a breach by the City, so the complaint does not allege a tortious interference claim. Also, the allegations about MB (only) are conclusory.

### B.    Tortious Interference by the City of Chicago (Count VII)

The next claim is about the contract for the light show. National Experiential alleges that the City tortiously interfered with its contract with MacDonald Media.

The City offers three reasons to dismiss the claim. *See* Def. City of Chicago's Mem., at 13–14 (Dckt. No. 77). First, the complaint does not allege that the City knew about the contract. Second, it does not allege that the City induced MacDonald Media to breach. And third, it does not allege that MacDonald Media breached the contract.

National Experiential thinks that it pleaded a plausible tortious interference claim because the complaint alleges that Nike communicated with the City.  *See* Pl.'s Joint Resp., at 17 (Dckt. No. 85).

In its prior ruling, the Court dismissed the tortious interference claim about MacDonald Media.  *See* 3/9/22 Mem. Opin. & Order, at 23 (Dckt. No. 68).  The Court explained that the first complaint "d[id] not allege that the City encouraged MacDonald Media to breach its contract with National Experiential."  *Id.*

The amended complaint is more of the same.  The City apparently knew that *Nike* was involved.  *See* Am. Cplt., at ¶¶ 32–33 (Dckt. No. 72).  For instance, a lawyer from the athleticwear brand sent the City materials about the purported artistic nature of the projections.  *Id.* at ¶ 32.  But the complaint does not suggest that the City so much as heard the words "MacDonald Media."

For example, National Experiential did not plead that representatives from the City were copied on email threads alongside representatives from MacDonald Media.  *See generally id.* at ¶¶ 1–106.  National Experiential did not plead that anyone from the City was ever in contact with anyone from MacDonald Media, at all.

Viewing the pleadings in the light most favorable to National Experiential, the facts support an inference that the City knew about an underlying contract for the light projections.  It wouldn't take much for the City to conclude that National Experiential was working with Nike, when Nike's logo was front and center in the planned display.  And when the City pulled the plug on the License Agreement, it might have realized that it was putting National Experiential's underlying contract in jeopardy.

But "[e]stablishing inducement, in the context of a claim for tortious interference with a contract, requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way." *In re Estate of Albergo*, 656 N.E.2d 97, 103 (Ill. App. Ct. 1995) (cleaned up); *see also Aon plc v. Alpine Rewards, LLC*, 2023 WL 3713987, at *11 (N.D. Ill. 2023) ("Illinois law 'requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another.'") (quoting *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 802 (N.D. Ill. 2011)).

National Experiential does not plead facts supporting an inference that the City actively persuaded, encouraged, or incited MacDonald Media (or Nike) to break a contract with National Experiential. *Estate of Albergo*, 656 N.E.2d at 103. So National Experiential hasn't pleaded the inducement element of the tortious interference claim.

If anything, the complaint appears to allege the opposite. The complaint alleges that the City pulled the plug on the project. MacDonald Media and Nike could see that the writing was on the wall, so they didn't let the lights go on the building.

Thus, Count VII is dismissed.

## IV.    Civil Conspiracy Claim (Count VIII)

Count VIII alleges that all Defendants were part of a civil conspiracy. *See* Am. Cplt., at ¶¶ 108–11 (Dckt. No. 72).

The complaint does not specify whether the claim arises under federal or state law.

National Experiential's briefing does not clarify this point, either. The company contends that it "sufficiently pled that all defendants engaged in a civil conspiracy to violate the First and Fourteenth Amendments," which suggests a violation of federal law. *See* Pl.'s Joint Resp., at 17 (Dckt. No. 85) (cleaned up). But National Experiential cites Illinois case law to define the

elements of a conspiracy, and it seems to allege that tortious interference (a state law claim) gave rise to the civil conspiracy claim.  *Id.* at 18.

Whether its claim arises under state or federal law, National Experiential must show that a co-conspirator committed an unlawful act.  *See Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994) ("To state a cause of action for conspiracy, a plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but also that such act was tortious or unlawful in character."); *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053 (Ill. 2020) (requiring an injury caused by an unlawful overt act for an Illinois civil conspiracy claim); *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) ("Civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means.  To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights.") (cleaned up).

National Experiential has not pleaded a violation of state law, so any state law civil conspiracy claim must fail.

Separately, to plead a civil conspiracy under federal or state law, a plaintiff must plead that there was an agreement.  *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) ("The agreement is a necessary and important element" of a civil conspiracy claim under Illinois law.); *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) ("To prevail on a [section 1983] conspiracy claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights . . . .") (quotation marks omitted).

National Experiential contends that Defendants "agreed together to tortiously interfere with Plaintiff's contracts."  *See* Pl.'s Joint Resp., at 18 (Dckt. No. 85).

The complaint alleges that "the Defendants agreed among themselves by email and/or phone calls to accomplish, by concerted action, the termination of Plaintiff Millennium Park License Agreement and Plaintiff's contract with McDonald Media and Nike in order to promote the privately owned Chicago Bulls instead on the NBA All-Star game weekend in 2020 by unlawfully and tortiously interfering with Plaintiff's contracts." *See* Am. Cplt., at ¶ 108 (Dckt. No. 72).

Once again, the complaint simply offers a legal conclusion – *i.e.*, that Defendants agreed to tortiously interfere with National Experiential's contracts. *Id.* But legal conclusions aren't enough to survive a motion to dismiss. *See Evers v. Reak*, 21 F. App'x 447, 450 (7th Cir. 2001) ("Vague and conclusory allegations of the existence of a conspiracy are not enough to sustain a plaintiff's burden[;] a complaint must contain factual allegations suggesting that the defendants reached a meeting of the minds."); *Rodgers v. Lincoln Towing Serv., Inc.*, 596 F. Supp. 13, 21 (N.D. Ill. 1984), *aff'd*, 771 F.2d 194 (7th Cir. 1985) ("Copious use of the words 'agreement,' 'in concert,' and 'conspiracy' does not create a conspiracy. What is needed are facts . . . ."); *Flores v. City of Chicago*, 682 F. Supp. 950, 953 (N.D. Ill. 1988) ("A conspiratorial agreement cannot be inferred from the averment that overt acts were committed in furtherance of the conspiracy.").

To be sure, the complaint asserts that the CSC and Bachman wanted the Prudential Building lit up in Bulls red for the weekend, in place of National Experiential's display. *See* Am. Cplt., at ¶ 36 (Dckt. No. 72). But that allegation does not suggest that Defendants agreed to deprive National Experiential of its rights.

National Experiential has not pleaded an agreement. So, National Experiential's civil conspiracy claim fails. The Court dismisses Count VIII.

**Conclusion**

For the reasons stated above, the Court grants MB's motion to dismiss, and grants the motion to dismiss filed by the CSC and Bachman.

The Court grants in part and denies in part the City's motion to dismiss. The Court denies the City's motion to dismiss Counts I and III, which fall under the First Amendment. The Court grants the City's motion to dismiss Count II (another First Amendment claim), as well as Counts V, VI, VII, and VIII (the state law claims). For Count IV (another First Amendment claim), the Court grants the City's motion to dismiss to the extent that National Experiential brings a facial challenge, and denies the motion to dismiss to the extent that National Experiential brings an as-applied challenge.


Date: August 9, 2024

Steven C. Seeger
United States District Judge