**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL EXPERIENTIAL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-810 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# MEMORANDUM OPINION AND ORDER

The City of Chicago hosted the NBA All-Star Game in February 2020. It was a marquee day for a marquee sport, showcasing some of the best athletes in the world. From a marketing perspective, it was a golden opportunity for anyone who wanted to promote their brands, attract attention, and get the word out.

National Experiential, a marketing and advertising company, wanted in on the action. It struck a deal with Nike to put on a laser light display projected onto two downtown skyscrapers. The projection would feature a video of a gravity-defying moment from a Chicago Bulls icon: Michael Jordan's legendary dunk in the 1988 Slam Dunk Contest, accompanied by Nike's familiar "Jumpman" logo.

To make it happen, National Experiential signed a contract with a department of the City and obtained a license to place projection equipment in Millennium Park. But the agreement came with strings attached. The City had broad authority to cancel the contract at any time and for any reason. And more ominously, National Experiential was responsible for obtaining any necessary permits.

National Experiential thought that it had cleared that hurdle. Based on assurances from MB Real Estate Services, the private company that manages Millennium Park, National Experiential believed that it didn't need a permit.

As it turns out, MB Real Estate had it wrong. National Experiential did need a permit. To make matters worse, it didn't have one. And to make things doubly worse, it *couldn't* get one.

A local ordinance banned temporary illuminated signs and dynamic displays for commercial speech. Unfortunately for National Experiential, the Nike projection was a double whammy: it was illuminated *and* dynamic. So, the City pulled the plug on the project.

National Experiential scrambled to save the show. It tried to convince the City that the projections fell within the ordinance's exemption for "art with no commercial message." The company's pleas fell on deaf ears.

National Experiential's light show was no more. But to the company's surprise, some of Chicago's skyscrapers ended up illuminated that weekend after all. The Prudential Building was lit up in red, the color associated with the Chicago Bulls, and the nearby Blue Cross building displayed an image reading, "NBA All-Star 2020."

According to National Experiential, that was no coincidence. The Chicago Sports Commission ("CSC") and its executive director Kara Bachman had allegedly worked behind the scenes to spike the Nike projections so that the Prudential Building could get lit red instead.

National Experiential responded by filing an eight-count complaint against the City, the CSC, Kara Bachman, and MB Real Estate Services. After two rounds of motions to dismiss, only the First Amendment claims against the City remain.

After discovery, the parties filed cross motions for summary judgment. For the reasons stated below, the Court grants the City's motion, and denies National Experiential's motion.

**Background**

**I. The Project**

National Experiential is an advertising and marketing agency. *See* Pl.'s Statement of Undisputed Facts, at ¶ 1 (Dckt. No. 134). It draws attention to its clients and heightens brand awareness through laser projections, custom digital installations, and street level displays. *Id.*

In December 2019, National Experiential landed a contract with Nike – through its agent, MacDonald Media – to provide light projections in Chicago during the NBA's 2020 All-Star weekend. *Id.* at ¶ 2. Under the contract, National Experiential agreed to perform projections on the Prudential Building and on the Aon Center on the nights of February 14 and 15, 2020. *See* Contract, Pl.'s Ex. 3 (Dckt. No. 134-3).

For out-of-towners, the Prudential Building and the Aon Center are large skyscrapers on the north end of Millennium Park in downtown Chicago. They're especially visible from Lake Shore Drive and Michigan Avenue, and they're sometimes illuminated for special events.

The Prudential Building is a wider, shorter building, and the Aon Center is a narrower, taller building (one of the tallest in Chicago). They hover over Millennium Park like Laurel and Hardy.

The light show was supposed to project Nike imagery. On the Prudential Building, the display would include a video of Michael Jordan's iconic, gravity-defying dunk at the 1988 All-Star Game. *See* Def.'s Statement of Undisputed Facts, at ¶ 12 (Dckt. No. 131). He might still be in the air.

On the Aon Center, the display would feature the word "UNITE," with the Nike Jumpman logo in place of the "I." *Id.*

The record includes a mock-up of the anticipated display's closing frame. Again, the display was dynamic, so the images changed. Sometimes the Prudential Building would have a picture of the Nike logo:




*See* Def.'s Statement of Undisputed Facts, at 4 (Dckt. No. 131).

And sometimes the Prudential Building would show a video of Jordan flying through the air and dunking the ball:




*Id.*[1]

National Experiential wanted to project the light show from equipment housed in Millennium Park. As one can imagine, that type of project comes with a lot of logistics. So, National Experiential got to work.

The company first contacted the City of Chicago Department of Cultural Affairs and Special Events ("DCASE"). *See* Pl.'s Statement of Undisputed Facts, at ¶ 9 (Dckt. No. 134). DCASE then connected National Experiential with MB Real Estate Services ("MBRE"), a private company that manages Millenium Park. *Id.* If National Experiential wanted to place its equipment in the park, it needed to go through MBRE.

---

[1] The statement of material facts includes a still photo of the display with the Nike logo on the Prudential Building. The record also include a link to the video of the entire display itself. *See* Def.'s Statement of Undisputed Facts, at 4 (Dckt. No. 131). It runs for 35 seconds. This second photo (above) is a screen shot from that video.

Jonathon Scott, MBRE's private events manager, became National Experiential's point person for the light show. In a series of emails, Scott collected information about the project and National Experiential's needs, culminating in a price estimate for rental space in the park. *See* 12/10/19 Email, Pl.'s Ex. 13 (Dckt. No. 134-13).

And then came the $64,000 question: Did National Experiential need a permit?

Scott touched base with DCASE about whether National Experiential needed a permit. *See* 12/6/19 Email, Pl.'s Ex. 10 (Dckt. No. 134-10). Jennifer Johnson Washington of DCASE informed Scott that "no Special Event Permit Application" was needed. *Id.* But Washington suggested "loop[ing] in the Mayor's Office, 1st District and 42nd Ward for awareness." *Id.*

Scott relayed the message back to National Experiential. He explained that he "had checked with the city and they feel as long as you have permission from the buildings, there shouldn't be a Special Event Permit Application needed." *See* 12/10/19 Email, Pl.'s Ex. 13 (Dckt. No. 134-13).

In the ensuing back and forth by email, Scott requested additional information about the project, including a "description, dates and times of what you are producing" as well as "approvals from Prudential and Aon." *See* 1/28/19 Email Chain, Pl.'s Ex. 15 (Dckt. No. 134-15). Once he received this information, Scott promised to "send this on to the city for approval." *Id.*

In February 2020, National Experiential secured permission from the buildings and forwarded the approval letters to MBRE. *See* Pl.'s Statement of Undisputed Facts, at ¶¶ 19, 21, 23 (Dckt. No. 134).

## II. The Contract

With the building approvals in hand, National Experiential signed a License Agreement with MBRE (again, MB Real Estate Services, the manager of Millennium Park) and DCASE (again, the City's Department of Cultural Affairs and Special Events) for the proposed light show. *See* License Agreement, Pl.'s Ex. 23 (Dckt. No. 134-23).

The contract gave National Experiential a license "to use the spaces in Millennium Park" for a "Nike Light Promo for NBA All-Star Game." *Id.*

The contract did not say that National Experiential did not need a permit. And it did not purport to *grant* one, either.

Quite the opposite. The agreement warned National Experiential that it might need a permit, if local ordinances required one. *Id.* And the agreement put the burden squarely on the shoulders of National Experiential to get a permit, if a permit was necessary at all. *Id.*

"Licensee shall obtain and pay for all necessary permits and licenses, if any, required for the entertainment or activity being presented, and shall not do anything on the premises in violation of any laws, ordinances, rules, or requirements, and if the attention of the Licensee is called to any such violation, the Licensee shall immediately desist from or correct such violation." *Id.*

Nonetheless, based on MBRE's assurances, National Experiential thought it was in the clear. So, a few days before the event, the company started setting up its equipment in Millennium Park. *See* Pl.'s Statement of Undisputed Facts, at ¶ 26 (Dckt. No. 134).

## III. The Termination

Everything was going according to plan. Until things went south.

Two days before the light show, MBRE's Micah Lane sent National Experiential an email putting an end to the whole plan. Lane told the company that the projections were "not approved by the appropriate departments and cannot move forward." *See* 2/12/20 Email, Pl.'s Ex. 37 (Dckt. No. 134-37).

Lane explained that the projections violated section 17-12-0804-A of the Municipal Code. That ordinance provides: "Temporary signs may not be illuminated. Dynamic image display sign features and electronic elements are prohibited." *See* MCC § 17-12-0804-A. National Experiential's projections checked both of those boxes: they were illuminated *and* dynamic.

Lane also clarified that because MBRE "is solely responsible" for activities in Millennium Park, the License Agreement covered only "load-in, load-out, staffing, and hosting of the tents, projectors" and the like. *Id.* It did *not* authorize the projections themselves. For that, National Experiential needed approval from the City of Chicago Department of Planning and Development, led by Zoning Administrator Patrick Murphey. *Id.*

Likely thanks to some good-old-fashioned miscommunication between City departments, the project landed on Murphey's desk for the very first time that very morning. *See* Pl.'s Statement of Undisputed Facts, at ¶ 39 (Dckt. No. 134). After reviewing mock-ups of the display, Murphey determined that they violated section 17-12-0804-A. *Id.* at ¶ 40.

A bureaucratic frenzy ensued as various City departments played a game of "who done it?" Murphey scrambled to figure out who had approved the project, and who, if anyone, knew anything about it. *See generally* 2/12/20 Email, Pl.'s Ex. 36 (Dckt. No. 134-36).

Murphey eventually learned about DCASE's involvement. He emailed Ann Hickey, a DCASE employee, letting her know that "the projection is not permitted under zoning temporary

special events signage rules." *Id.* Hickey looped in Micah Lane, who got stuck with the unenviable task of breaking the news to National Experiential. *Id.*

National Experiential was now in a bind. It had a contract with Nike. It needed the ability to project illuminated, changing images. And it didn't have a permit.

At that point, it was all hands on deck to save the show. National Experiential retained local counsel and went looking for a way around the problem. *See* Pl.'s Statement of Undisputed Facts, at ¶ 43 (Dckt. No. 134).

The company found a potential opening in the Municipal Code. The Code exempts "[w]orks of art with no commercial message" from its sign regulations. *See* MCC § 17-12-0504. The Code defines "commercial message" as "any sign, wording, or logo that directly advertises a specific business, proprietary product or service, or other commercial activity." *See* MCC § 17-17-0236.

In a last-ditch effort, National Experiential tried to convince the City that the Nike projection was "art with no commercial message." *See* Pl.'s Statement of Undisputed Facts, at ¶¶ 52, 53 (Dckt. No. 134). The City didn't buy it. *Id.* at ¶ 55.

On February 14 at 4:13 p.m., only 47 minutes before the light show was to begin, Murphey put the final nail in the coffin. He conceded that there was "little doubt that the [Jumpman logo] reflects artistic qualities." *See* 2/14/20 Email, Pl.'s Ex. 39 (Dckt. No. 134-40). But as Murphey saw things, the image could not be separated from its commercial meaning: "I do not see how we (or the general public) could parse that image out from the commercial aspect of what that image and outline means to Nike." *Id.*

So, it was "lights out" for National Experiential. But the Prudential Building didn't go dark. At the tipoff of All-Star weekend, the building ended up illuminated after all. It was

covered in red. An "NBA All-Star 2020" image also appeared on the nearby Blue Cross building (which wasn't covered by the National Experiential contract).[2] *See* Pl.'s Statement of Undisputed Facts, at ¶ 60 (Dckt. No. 134).

The record includes a picture of that display. The photo isn't perfect, but it is possible to see the red lights at the bottom of the Prudential Building (and on the *other* Prudential Building, known as "Pru 2," with the pointy top):




*See* Pl.'s Ex. 29-A (Dckt. No. 134-30).

According to National Experiential, the Chicago Sports Commission and its executive director, Kara Bachman, were behind the display on the Prudential Building. The CSC is the trade name of the Chicago Convention and Tourism Bureau.

[2] By the look of things, the Blue Cross building created the message "NBA All-Star 2020" simply by a well-choreographed effort of turning some lights on (inside the building), and turning some lights off. In effect, the Blue Cross building became a gigantic Lite-Brite. It apparently didn't involve a projection from Millennium Park.

The record includes the backstory, suggesting that the CSC lurked in the shadows and had its own plan for a projection during the All-Start Game.

In December 2019, the CSC asked the Prudential Building to light the façade red – the color of the Chicago Bulls – during the All-Star weekend. *See* Bachman Email, Pl.'s Ex. 28 (Dckt. No. 134-28). Prudential initially agreed. *Id.* But the building ended up double-booked, and Prudential called off the CSC's display in favor of National Experiential's. *Id.*

Kara Bachman was none-too-happy about that. So, she started asking questions. Bachman emailed DCASE probing for information about the Nike project, and planted the seed that the project may not have been approved by the appropriate departments. *See* 2/11/20 Bachman Email to DCASE, Pl.'s Ex. 30 (Dckt. No. 134-31). Bachman's tip set everything else in motion, culminating in the City pulling the plug.

Bachman wasted no time rubbing salt in the wound when she got what she wanted. Only ten minutes after Murphey blocked the Nike project, Bachman sent National Experiential an email and spiked the ball. She wrote: "You do not have approval to project. It's simple. NOT APPROVED." *See* 2/14/20 Bachman Email, Pl.'s Ex. 39 (Dckt. No. 134-40).

The email came as a surprise to National Experiential. Bachman had not been involved in the project before that point, and it was unclear why she was looped into the mix. National Experiential believed that the CSC must have pulled some strings from behind the curtain.

Whatever happened behind the scenes, the end result was the same. Without a permit, National Experiential's show was a no-go.

## IV. The Litigation

National Experiential decided that if it was going down, it was going down swinging. The company filed suit against the City, MBRE, the CSC, and Bachman. The amended

complaint asserted eight claims: four under the First Amendment, one for breach of contract, two for tortious interference with contract, and one for civil conspiracy. *See generally* Am. Cplt. (Dckt. No. 72).

After motions to dismiss, this Court dismissed all claims against MBRE, the CSC, and Bachman. The Court dismissed some claims against the City, too.

The only remaining claims are First Amendment claims against the City. One claim is a facial challenge, and another claim is an as-applied challenge. The other claim alleges excessive discretion.

At the close of discovery, the parties filed cross motions for summary judgment. The City also filed a *Daubert* motion against National Experiential's expert.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or

determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the nonmovant. *See Celotex Corp.*, 477 U.S. at 322.

**Analysis**

National Experiential has three surviving claims under the First Amendment.

The first remaining claim is a facial challenge to section 17-12-0504 of the Municipal Code (Count I). The company argues that the ordinance is an unlawful content-based regulation because it treats commercial speech less favorably than artistic speech.

The second remaining claim is an as-applied challenge (Count III). The company claims that the City selectively enforced the ordinance to suppress National Experiential's viewpoint.

The last remaining claim alleges excessive discretion (Count IV). National Experiential argues that the ordinance's exemption gives the Zoning Administrator too much leeway to determine what qualifies as "art with no commercial message."

Before diving in, a little housekeeping is necessary.

As this Court explained in its motion to dismiss order, Count I of the amended complaint "lacks clarity." *See* 8/9/24 Order, at 21 (Dckt. No. 95). It is difficult to decipher what type of challenge National Experiential intends to bring and the grounds on which it rests. After all, the First Amendment encompasses many doctrines, each with its own framework and application. Simply invoking "freedom of speech" doesn't shed a lot of light.

But the briefs at the motion-to-dismiss stage provided some clarity. *See* Pl.'s Joint Resp., at 2 (Dckt. No. 85). National Experiential explained that Count I advanced two theories. The

first theory is that the ordinance makes "content-based distinctions between commercial and artistic speech and is subject to strict scrutiny." *Id*. The second theory is that the City "engaged in viewpoint discrimination" by blocking National Experiential's projection while allowing the CSC to light the Prudential Building in red. *Id*. The first theory is a facial challenge, and the second theory is an as-applied challenge.

But National Experiential also brought a *separate* as-applied challenge in Count III. National Experiential claimed that the City had engaged in viewpoint discrimination by blocking its projection but allowing a display called "Art on the MART" elsewhere downtown.

So, it looks like Count I includes both a facial challenge and an as-applied challenge, and Count III is another as-applied challenge. But in their summary judgment briefs, the parties treated Count I as a facial challenge (only), and treated Count III as an as-applied challenge.

This Court will go with the flow. For the sake of clarity, the Court will construe Count I as a facial challenge, and Count III as one cohesive as-applied challenge. The as-applied challenge will cover both arguments advanced by National Experiential about viewpoint discrimination.

With that framing in mind, the Court turns to the facial challenge.

## I. Facial Challenge (Count I)

The first question is whether the ordinance is facially unconstitutional.

As a reminder, section 17-12-0804-A of the Municipal Code bans temporary signs that are illuminated. And it bans dynamic displays, too. The ordinance reads: "Temporary signs may not be illuminated. Dynamic image display sign features and elements are prohibited."

But section 17-12-0504 carves out exemptions to this general prohibition. For present purposes, the most important exemption involves artistic displays. The ordinance does not apply to "works of art with no commercial message."

National Experiential argues that the exemption creates a content-based distinction between commercial and non-commercial speech. And as National Experiential sees things, that distinction is facially unconstitutional.

Before addressing that issue, the Court will start by pinning down the level of scrutiny.

**A. Level of Scrutiny**

The parties disagree about the level of scrutiny that applies to the ordinance. In National Experiential's view, the ordinance treats speech differently based on its content, so strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155 (2015). As the City sees things, the ordinance addresses commercial speech, so intermediate scrutiny governs. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980).

The difference between strict scrutiny and intermediate scrutiny is no small thing. Oftentimes, it is everything. Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *See Reed*, 576 U.S. at 171. It is a difficult standard to meet, and "leaves few survivors." *See City of Los Angeles v. Alameda Books, Inc*., 535 U.S. 425, 455 (2002) (Souter, J., dissenting).

On the other hand, "[i]ntermediate scrutiny is not an overly demanding standard." *See GEFT Outdoor, LLC v. City of Westfield*, 39 F.4th 821, 825 (7th Cir. 2022). To survive intermediate scrutiny, a restriction only needs to be "narrowly tailored to serve a significant governmental interest." *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022) (cleaned up).

In *Reed*, the Supreme Court addressed a collection of ordinances that imposed different restrictions on different types of outdoor signs. The ordinances imposed tighter restrictions on political signs than ideological signs. And the ordinances placed even greater restrictions on temporary directional signs about a "qualifying event," such as a gathering or a meeting.

A church group placed 15 or 20 signs around town in Gilbert, Arizona, letting the public know the time and place of an upcoming service. But the city tagged the church with citations because the signs violated the time limit for signs about a qualifying event. So the church sued.

The Supreme Court reaffirmed that strict scrutiny applies to ordinances that treat speech differently based on its content. "Content-based laws – those that target speech based on its communicative content – are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 164.

"[A] speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 171. The question is whether a regulation "draws distinctions based on the message a speaker conveys." *Id.* at 163.

"Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* But "[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id*. at 163–64.

The Supreme Court applied strict scrutiny to the ordinances in question because they regulated speech based on its content. "[T]he Church's signs inviting people to attend its worship services are treated differently from signs conveying other types of ideas. On its face, the Sign Code is a content-based regulation of speech." *Id.* at 164.

The fact that the ordinance did not discriminate based on viewpoints did not matter. "[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 169. Strict scrutiny applied even though the ordinance didn't pick winners or losers, and didn't favor any viewpoint.

The existence of an innocent motive did not matter, either. "Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech." *Id.* at 167.

National Experiential believes that the City's treatment of commercial speech falls in the same category. At first glance, and after a second look, National Experiential might have a point. The notion that section 17-12-0504 is a content-based restriction has some intuitive appeal.

Under the ordinance, not all speech is created equal. The ordinance treats commercial speech differently than artistic speech. A sign conveying an artistic message receives more favorable treatment than a sign with a commercial message.

A display with Michael Jordan dunking a basketball would receive different treatment than, say, a display of Michelangelo's David. Both are other-worldly. But under the ordinance, they don't stand on equal footing.

Under *Reed*, a regulation is content-based if it "draws distinctions based on the message a speaker conveys." *Id.* at 163. It's hard to see how distinguishing between commercial speech and artistic speech does not require a distinction based on the "topic discussed or the idea or message expressed." *Id.*

Characterizing speech as commercial or non-commercial "depend[s] entirely on the communicative content of the sign." *Id.* It means that a display with the message "Buy X" or "Give Me Your Money" receives less protection than non-commercial speech.

Under the ordinance, a display of the Mona Lisa would receive more favorable treatment than a display of the Mona Lisa holding a bottle of Coca-Cola. Hokusai's Great Wave Off Kanagawa would receive favorable treatment, unless the U.S. Navy uses it as part of a recruiting campaign.

The ordinance would treat a display of Edvard Munch's The Scream differently than it would treat an advertisement for the next Scream movie. Edward Hopper's painting of the diner in *Nighthawks* would receive more protection than an advertisement for the Waffle House.

At the very least, giving commercial speech less protection requires the government to draw lines based on the "subject matter," which triggers strict scrutiny. *Id.* at 163 ("[A] government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its *subject matter*, or its *content*.'") (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972)) (emphasis added). Put another way, a regulation of commercial speech covers the "public discussion of an entire topic" – the need to buy something – so it's hard to see why strict scrutiny doesn't apply. *Id.* at 169.

Even so, *Reed* is part of a broader ecosystem of First Amendment jurisprudence. Commercial speech is firmly embedded in the case law and occupies a distinct place in the First Amendment hierarchy. For decades, the Supreme Court has drawn a bright line around commercial speech, and has treated it differently than other forms of speech.

"[T]he Constitution [] accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv.*

*Comm'n of New York*, 447 U.S. 557, 563 (1980). In *Central Hudson*, the Supreme Court articulated a more forgiving, intermediate scrutiny standard for commercial regulations. *See Cent. Hudson*, 447 U.S. at 564–66.

In the decades that followed, the Supreme Court has poured cement around the notion that commercial speech receives less protection than other forms of speech. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579 (2011) ("It is true that content-based restrictions on protected expression are sometimes permissible, and that principle applies to commercial speech. Indeed the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.'") (citations omitted); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (explaining that commercial speech "is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression'") (citations omitted).

One wonders if *Central Hudson* can live in harmony with *Reed*. A broad if-not-literal reading of *Reed* suggests that the government cannot give different levels of protection to different categories of speech. But *Central Hudson* authorizes the government to do just that. It gives the government greater latitude to regulate commercial speech than other forms of expression.

The Seventh Circuit has not addressed whether *Reed* changed the rules of the game when it comes to commercial speech and strict scrutiny. It flagged the issue once, but set it aside. *See Leibundgut Storage & Van Serv., Inc. v. Vill. of Downers Grove*, 939 F.3d 859, 860 (7th Cir. 2019) ("We need not decide which decision – *Reed* or *Central Hudson* – must give way when a commercial sign law includes content discrimination.").

But many other courts have concluded that *Reed* did not disturb the commercial speech doctrine. *See, e.g.*, *Peterson v. Vill. of Downers Grove*, 150 F. Supp. 3d 910, 928 (N.D. Ill. 2015) ("[A]bsent an express overruling of *Central Hudson*, which most certainly did not happen in *Reed*, lower courts must consider *Central Hudson* and its progeny . . . binding."); *Adams Outdoor Advert. Ltd. P'ship v. City of Madison*, 2020 WL 1689705, at *3 (W.D. Wis. 2020) ("*Reed* leaves intact the general framework for evaluating restrictions on commercial speech . . . ."); *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 732 (9th Cir. 2017) ("*Reed* did not relate to commercial speech . . . and therefore did not have occasion to consider those doctrines."); *Aptive Environmental v. Town of Castle Rock*, 959 F.3d 961, 986–99 (10th Cir. 2020) (applying *Central Hudson* to a town ordinance that prohibited commercial door-to-door solicitation but allowed other forms of solicitation); *see also* Susan L. Trevarthen & Adam M. Hapner, *The True Impact of* Reed v. Town of Gilbert *on Sign Regulation*, 49 Stetson L. Rev. 509, 528 (2020) ("[E]ssentially every court to address this issue has decided that *Reed* had no impact on the commercial speech doctrine."); *but see Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 708 (6th Cir. 2020) (concluding that regulating commercial and non-commercial speech differently triggers strict scrutiny).

A few years ago, the Supreme Court dropped a footnote and acknowledged that commercial speech receives less protection. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 66 n.1 (2022) ("This Court's precedents have also declined to apply strict scrutiny to several other types of content-based restrictions, including laws targeting 'commercial speech.'") (citing *Central Hudson*). So maybe *Central Hudson* remains alive and well after all.

Maybe *Central Hudson* sits on a slender reed. Maybe a natural extension of *Reed* means that strict scrutiny should apply to commercial speech, too.

But *Central Hudson* remains good law, unless and until the Supreme Court says otherwise. Lower courts cannot overrule a Supreme Court case, even if it seems at odds with later precedent. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago*, 567 F.3d 856, 857 (7th Cir. 2009), *overruled on other grounds by McDonald v. City of Chicago*, 561 U.S. 742 (2010) ("Repeatedly, in decisions that no one thinks fossilized, the Justices have directed trial and appellate judges to implement the Supreme Court's holdings even if the reasoning in later opinions has undermined their rationale.").

*Reed* might call into question *Central Hudson* and the commercial speech doctrine. But the Supreme Court in *Reed* didn't address whether its holding extended to commercial speech, either. That question wasn't before the Supreme Court, so the Supreme Court didn't answer it. Unless and until the Supreme Court overrules *Central Hudson*, intermediate scrutiny continues to apply to regulations of commercial speech.

The distinction between commercial speech and non-commercial speech is one of the girders holding up an entire body of First Amendment jurisprudence. Only the Supreme Court has the leverage strong enough to move it. In the meantime, this Court will accept that pillar as it stands.

Under *Central Hudson*, courts apply intermediate scrutiny to restrictions on commercial speech. The ordinance in question places a restriction on commercial speech. So intermediate scrutiny applies.

**B. Applying *Central Hudson***

The next question is whether the ordinance survives intermediate scrutiny.

Under *Central Hudson*, courts must consider whether: (1) the commercial speech concerns a lawful activity and is not false or misleading; (2) the asserted governmental interest is substantial; (3) the regulation directly advances the governmental interest asserted; and (4) the restriction is no more extensive than necessary to serve that interest. *See Cent. Hudson*, 447 U.S. at 564–66. The government has the burden of identifying a substantial interest and justifying the challenged restriction. *See Edenfield v. Fane*, 507 U.S. 761, 770 (1993).

The first factor isn't an issue. The City concedes that National Experiential's projections were not false or misleading.

The second prong asks whether the regulation involves a substantial governmental interest. Here, the City gave two reasons for prohibiting temporary signs with illumination and dynamic images: "traffic safety (i.e., minimizing distractions to drivers), and aesthetics (i.e., minimizing visual clutter)." *See* Def.'s Mem. in Support of Mtn. for Summary J., at 9 (Dckt. No. 145).

The Supreme Court and the Seventh Circuit have recognized that "promoting traffic safety and preserving visual aesthetics" qualify as "significant governmental interests." *See Adams Outdoor*, 56 F.4th at 1120 (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507 (1981)); *see also Leibundguth Storage & Van Service, Inc. v. Vill. of Downers Grove*, 939 F.3d 859 (7th Cir. 2019) ("The Supreme Court has told us that aesthetic limits on signs are

compatible with the First Amendment."); *Peterson v. Vill. of Downers Grove*, 2016 WL 3538929, at *5 (N.D. Ill. 2016) ("[A] general interest in aesthetics is recognized as a significant governmental interest.").

The third prong addresses whether the regulation directly advances that governmental interest. The ordinance passes that test, too.

The City wants to avoid distractions for drivers, and wants to keep Chicago the most beautiful city in America. The City was well within its rights to conclude that banning illuminated signs and dynamic displays containing commercial messages would promote those goals. Not everyone wants Chicago to look like Times Square.

The fourth prong is a closer call. The City must show that the ordinance is no more extensive than necessary.

In the commercial speech context, "no more extensive" means "something short of a least-restrictive-means standard." *See Board of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 477 (1989); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) ("The least restrictive means is not the standard.") (cleaned up). A municipality only needs to show a "reasonable" fit between the ends and the means. *See Fox*, 492 U.S. at 480.

"What our decisions require is a 'fit' between the legislature's ends and the means chosen to accomplish those ends – a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* (cleaned up) (citing *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 344 (1986)).

"This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it

recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71. "The regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Cent. Hudson*, 447 U.S. at 564.

The City argues that there is a reasonable fit between the ordinance and its interests. In its view, the prohibition on illuminated signs and dynamic displays reduces traffic hazards and promotes an attractive visual environment.

That's probably true. But National Experiential does not challenge the City's general prohibition on illuminated or dynamic signs. It specifically challenges the City's ban on illuminated *commercial* projections while exempting "art with *no commercial message*."

The relevant question is not whether prohibiting illuminated and dynamic signs *generally* reduces the risk of car crashes or visual clutter. The question is whether treating commercial and non-commercial signs differently advances those interests.

The City bans some illuminated signs and visual displays (involving commercial speech), but not others (involving artistic speech). The existence of the exemption calls into question whether the regulation is a reasonable fit.

An exemption to a speech restriction can "raise doubts about whether the government is in fact pursuing the interest it invokes" or "reveal that a law does not actually advance a compelling interest." *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448–49 (2015).

The Supreme Court's decision in *City of Cincinnati v. Discovery Network* illustrates the point. There, the City of Cincinnati banned the distribution of commercial handbills from newsracks, but imposed no similar ban on "regular" newspapers. *See City of Cincinnati v. Discovery Network*, 507 U.S. 410, 413–14 (1993). The case involved commercial speech, so *Central Hudson* governed.

Cincinnati justified the regulation by pointing to safety and aesthetics. *Id*. at 416. The Supreme Court acknowledged that those interests are substantial. Even so, the Supreme Court found a lack of meaningful connection between the commercial/non-commercial distinction and Cincinnati's asserted interests. *Id*. at 427 (finding no "basis for distinguishing between 'newspapers' and 'commercial handbills' [] relevant to an interest asserted by the city").

The record showed that commercial and non-commercial newsracks posed equal safety problems and were equally ugly. So the distinction bore "no relationship whatsoever to the particular interests that the city has asserted." *Id*. at 424. The regulation was also woefully underinclusive. *Id.* at 417–18. Commercial newsracks made up only a small fraction of the total newsracks on Cincinnati's streets, so banning them could not "directly advance" safety or aesthetics.

The Seventh Circuit applied *Discovery Network* to strike down another underinclusive restriction in *Pearson v. Edgar*, 153 F.3d 397 (7th Cir. 1998). There, the Seventh Circuit considered an Illinois statute that prohibited real estate agents from soliciting homeowners, but did not prohibit other forms of solicitation. *Id.* at 399.

The Court of Appeals held that the restriction failed *Central Hudson* because it lacked a sufficient fit with the government's stated interest in residential privacy. The government "produced no evidence [] that real estate solicitation harms or threatens to harm residential privacy" any differently than other forms of solicitation. *Id*. at 404. "Absent such evidence, a mechanism whereby homeowners can reject real estate solicitation but not other kinds of solicitation cannot be said to advance the interest in residential privacy in a direct and material way." *Id*. (cleaned up).

In the case at hand, the same problem applies to the professed justification about traffic safety. It's easy to understand why a visual display could distract drivers. The whole point is that they're supposed to attract attention, and show eye-catching imagery. If a driver is looking at a light show, their eyes aren't on the road.

Still, the subject matter should make no difference when it comes to the ability to distract drivers. An artistic display can distract drivers just as much as commercial speech. Imagine an oversized illuminated display of Mona Lisa walking hand-in-hand through a meadow with Michelangelo himself, with a jealous David watching longingly in the background. It might cause drivers to look up, give a look, and not see the helmetless twenty-something bro-dude pedaling super slowly on a Divvy bike.

There is nothing about *commercial* speech that is inherently more distracting to drivers than artistic speech. Everyone loves looking at Michael Jordan perform his magic on the basketball court. But plenty of people enjoy gazing at artwork, too. It's hard to take your eyes off both of them.

The City argues that banning commercial speech would cut down on the problem of distracted drivers. In its view, "most temporary signs using illumination or dynamic images are commercial displays, not non-commercial works of art." *See* Def.'s Mem. in Support of Mtn. for Summary J., at 14 (Dckt. No. 145).

But the City presented no evidence that most illuminated and dynamic displays involve commercial speech, not artistic expression. So that argument doesn't advance the ball. *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary judgment . . . is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.") (cleaned up).

The desire to avoid distracted drivers is an understandable goal. But a ban on commercial speech (only) with no comparable ban on artistic speech doesn't advance that goal in a manner that is no more restrictive than necessary.

The desire to promote aesthetics is another story. Aesthetics are about taste, and taste is in the eye of the beholder. *See Leibundguth Storage & Van Serv., Inc. v. Vill. of Downers Grove*, 939 F.3d 859, 860 (7th Cir. 2019) ("People's aesthetic reactions are what they are.").

A municipality could decide that commercial speech is harder on the eyes than artwork. Not everyone loves commercials, and getting subjected to flashing commercials might not be everyone's cup of tea. Dynamic images of phones, burgers, and mochaccinos might not rise to the level of Monet and Van Gogh. At the very least, a municipality could reach that conclusion. "It need not try to prove that aesthetic judgments are right." *Id.*

For better or worse, the City decided that illuminated art is more pleasing to the eye than illuminated advertising. "It is not speculative to recognize that [advertisements] by their very nature, wherever located and however constructed, can be perceived as an 'esthetic' harm. This is common sense." *See Peterson*, 2016 WL 3538929, at *5 (citing *Metromedia*, 453 U.S. at 510). One may disagree that art is prettier than ads, but the City's judgment is reasonable. The Court will not second-guess it.

The distinction between commercial and non-commercial signs directly advances the City's interest in preserving an attractive visual environment. Since the City need only show that the ordinance directly advances one of its interests, the ordinance survives *Central Hudson*.

### C. Non-Commercial and Non-Artistic Speech

There is one other potential wrinkle, which the parties don't iron out.

The ordinance creates a general rule. "Temporary signs may not be illuminated. Dynamic image display sign features and electronic elements are prohibited." *See* MCC § 17-12-0804-A.

The ordinance then includes an exemption, and draws a distinction between commercial speech and artistic speech with no commercial message. "The following are exempt from regulation under this Zoning Ordinance . . . Works of art with no commercial message." *See* MCC § 17-12-0504.

So, the ordinance imposes a general rule. It covers commercial speech, and it doesn't cover artistic speech with no commercial message.

By its terms, the ordinance sweeps in everything except *artistic* speech without a commercial message. The breadth imposes a potential problem.

Some speech is not commercial, but is not artistic, either. For example, an illuminated political message would fall within the general prohibition. Imagine a dynamic display for the DNC or the GOP to celebrate a national convention. An illuminated religious message would come within its reach, too. An illuminated temporary sign saying "Welcome Home, Pope" would fit the bill.

In other words, the universe of speech is broad, and not everything falls within the commercial vs. artistic divide. Some speech is non-commercial *and* non-artistic. And the ordinance bans that speech, too.

*Central Hudson* gives the government greater latitude to regulate commercial speech. But it doesn't give the government a free pass to discriminate between different kinds of non-commercial speech. *See Metromedia*, 453 U.S. at 515 ("With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse."). So, presumably

strict scrutiny would apply to an ordinance that treats some categories of non-commercial speech more favorably than others (*i.e.*, art versus non-art).[3]

That type of treatment looks much more like a straightforward content-based distinction governed by *Reed*. Indeed, at least two circuits have interpreted similar ordinance exemptions as content-based. *See, e.g.*, *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (applying strict scrutiny to a sign regulation exempting "works of art" that "in no way identify or specifically relate to a product or service"); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1266 (11th Cir. 2005) ("[B]ecause some types of signs are extensively regulated while others are exempt from regulation based on the nature of the messages they seek to convey, the sign code is undeniably a content-based restriction on speech."); *see also Metromedia*, 453 U.S. at 515 ("Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.") (plurality opinion).

But National Experiential did not raise this argument. Instead, the company argues that "the City's zoning ordinance makes unlawful content-based distinctions *between commercial and artistic speech*." *See* Pl.'s Mem. in Support of Mtn. for Summary J., at 11 (Dckt. No. 144).

---

[3] It is unclear that the ordinance distinguishes between "art" and "not art" in practice. Zoning Administrator Patrick Murphey testified that when evaluating whether a sign falls under the exemption, he "do[es] not determine what is art." *See* Murphey Dep. Tr., Vol. I, at 51:23-24, Pl.'s Ex. 26 (Dckt. No. 134-26). Instead, when his department is "presented with a sign to review pursuant to a building permit for zoning compliance, we compare that to the definition of a commercial message." *Id.* at 82:22-23; *see also* Def.'s Statement of Undisputed Facts, at ¶ 32 (Dckt. No. 131) ("Murphey and the Department of Planning and Development do not make determinations regarding whether a sign is 'art.' Instead, they apply the definition of a 'commercial message' in Municipal Code Section 17-17-0236 to determine whether something is or is not 'art with no commercial message.'"). Under this approach, it seems like *any* non-commercial sign could qualify for the exemption. But all of this is potential ammunition for an as-applied challenge, and the argument at hand is a facial challenge.

The challenge is about the distinction between commercial speech and artistic speech. It isn't about non-commercial, non-artistic speech that might get ensnared in the regulation. And as explained, the government may permissibly subject commercial speech to additional restrictions. *See Sorrell*, 564 U.S. at 579 (explaining that commercial speech "can be subject to greater governmental regulation than noncommercial speech") (citation omitted).

"It is not [the Court's] responsibility to construct arguments for the litigants. Failure to adequately explain one's argument is waiver." *See United States v. Weiss*, 153 F.4th 574, 587 (7th Cir. 2025); *see also Hayes v. City of Chicago*, 670 F.3d 810, 815 (7th Cir. 2012) ("A party waives an argument by failing to make it."); *United States v. Thornton*, 642 F.3d 599, 606 (7th Cir. 2011) ("Undeveloped and unsupported arguments may be deemed waived."). So, the Court declines to go down this route.

*  *  *

No genuine dispute of fact relevant to the facial challenge remains, so the Court grants summary judgment for the City on Count I.

**II. As-Applied Challenge (Count III)**

As a fallback, National Experiential brings an as-applied challenge to the enforcement of the regulation.

Candidly, the contours of National Experiential's as-applied challenge are hazy. As best the Court can tell, the company argues that the City engaged in viewpoint discrimination by selectively enforcing the ordinance to favor one speaker (the CSC) over another (National Experiential).

The government cannot "regulat[e] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). That's viewpoint discrimination.

Viewpoint discrimination is a particularly "egregious form of content discrimination." *Id.* Content discrimination takes place when the government bans speech about an entire topic. For example, imagine if a public school banned all political buttons during class time. That prohibition restricts speech about Republicans, Democrats, and all other political parties equally.

Viewpoint discrimination takes place when the government targets a specific perspective *within* a topic. Imagine if the same school banned buttons supporting Republicans, but allowed buttons that support Democrats (or vice versa). In that situation, the government favors one side over the other. "When speakers and subjects are similarly situated, the state may not pick and choose." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 55 (1983).

A regulation might discriminate against different viewpoints on its face. But a municipality also could discriminate by enforcing a facially-neutral regulation against some speakers, but not others. *See Uptown Tent City Organizers v. City of Chicago Dep't of Admin. Hearings*, 2018 WL 2709431, at *11 (N.D. Ill. 2018) (explaining that the First Amendment "prohibits viewpoint discrimination through selective enforcement of an otherwise facially neutral law").

An as-applied challenge based on viewpoint discrimination requires a plaintiff to "show that he was prevented from speaking while someone espousing another viewpoint was permitted to do so." *See McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). But the existence of an inconsistency isn't enough. After all, there are a number of perfectly legitimate reasons for uneven enforcement of a speech regulation.

For instance, when a law gives government officials discretion to determine whether a violation occurred, different officials might reasonably reach different conclusions. *See Liner v. FCA US LLC*, 333 F.R.D. 122, 128 (N.D. Ill. 2019) ("[D]iscretion allows two decision-makers – on virtually identical facts – to arrive at opposite conclusions, both of which constitute appropriate exercises of discretion.").

A municipality also might enforce a regulation unevenly simply because officials do not know about every violation. *See Constr. & Gen. Laborers' Union No. 330 v. Town of Grand Chute*, 915 F.3d 1120, 1124 (7th Cir. 2019) (finding no viewpoint discrimination where zoning official did not "ferret[] out *every* non-compliant sign") (emphasis added). The Constitution "does not require states to enforce their laws (or cities their ordinances) with Prussian thoroughness." *See Tuffendsam v. Dearborn Cnty. Board of Health*, 385 F.3d 1124, 1128 (7th Cir. 2004) (quoting *Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir. 1985)).

Without more, isolated incidents of inconsistent enforcement do not amount to viewpoint discrimination. *See Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 700 (2010) (Stevens, J. concurring) ("[I]t is a basic tenet of First Amendment law that disparate impact does not, in itself, constitute viewpoint discrimination."); *but see Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) (noting that a "pattern of unlawful favoritism" could suffice).

Proving an inconsistency isn't enough. To bring a claim about viewpoint discrimination, a plaintiff must go one step further. A plaintiff must show that he was treated differently *because* of his viewpoint. *See Raio v. City of Chicago*, 2026 WL 515703, at *7 (N.D. Ill. 2026) ("To substantiate a claim for First Amendment viewpoint and content discrimination, Plaintiffs must plead that" a speech restriction "was motivated by the ideology or the opinion or

perspective that they wished to express."); *see also Uptown Tent City Organizers*, 2018 WL 2709431, at *11 (N.D. Ill. 2018) (dismissing a viewpoint discrimination claim when the plaintiff "failed to [] allege that the City applied its regulations based on viewpoint discrimination *as opposed to any number of non-discriminatory considerations*") (emphasis added).

The Seventh Circuit has not stated that principle quite so explicitly. But several of its opinions veer in that direction. *See, e.g.*, *Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998) (rejecting a viewpoint discrimination claim when the government restricted speech for neutral reasons).

For example, in *Construction and General Laborers' Union No. 330 v. Town of Grand Chute*, a workers' union used a giant inflatable rat, affectionally nicknamed "Scabby," to protest a company's labor practices. *See Grand Chute*, 915 F.3d at 1121–23. Unfortunately for the union, a town ordinance prohibited certain kinds of signs in public rights-of-way, and Scabby fit the bill. After determining that Scabby was a "sign" within the meaning of the ordinance, zoning officer Eric Thiel ordered the union to remove him. *Id.* at 1123–26. The rat had to scat.

The union argued that the town selectively enforced the ordinance because it disliked Scabby's pro-worker message. *Id.* To support its position, the union pointed to a number of other sign violations that Thiel supposedly let slide.

The Seventh Circuit rejected the argument, concluding that there was no evidence of "actual favoritism." *Id.* at 1124. To the contrary, the evidence showed that Thiel "investigated every one of the signs identified by the Union" and "[took] action where he found a violation." *Id.* at 1125.

Thiel testified that he held every sign to the same standard. He enforced the regulation every time he spotted a violation. Although Thiel "may not have ferreted out every non-

compliant sign," he testified that he had never failed to enforce a violation when he spotted a violation. *Id.*

If Thiel treated some signs differently, he did so based on his view about whether the sign violated the ordinance. *Id.* Whether "he was correct" in those determinations "[did] not matter" for purposes of the viewpoint discrimination claim. *Id.* at 1126.

Other circuits likewise recognize that an as-applied challenge about viewpoint discrimination requires a showing that the government selectively enforced a regulation based on the message itself. *See, e.g.*, *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 635 (4th Cir. 2016) ("A selective enforcement claim of this nature requires a plaintiff to demonstrate that the government's enforcement process 'had a discriminatory effect *and* that it was motivated by a discriminatory purpose.' Thus, a plaintiff must show not only that similarly situated individuals were treated differently, but that there was 'clear and intentional discrimination.'") (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)) (emphasis added); *Brown v. City of Pittsburgh*, 586 F.3d 263, 294 (3d Cir. 2009) ("In order to establish municipal liability for selective enforcement of a facially viewpoint- and content-neutral regulation, a plaintiff whose evidence consists solely of the incidents of enforcement themselves must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content."); *Phelps-Roper v. Ricketts*, 867 F.3d 883, 897 (8th Cir. 2017) ("To sustain an as-applied challenge based on viewpoint discrimination, [the plaintiff] must establish a 'pattern of unlawful favoritism . . . .'") (citation omitted).

The upshot is that at the summary judgment stage, National Experiential must present sufficient evidence to support a finding by a reasonable jury that the City called off the Nike

projection because of its viewpoint. That is, National Experiential must show that the City favored one speaker over another, and did so based on the content of the message itself.

National Experiential has not made that showing. The undisputed facts show that Zoning Administrator Patrick Murphey pulled the plug on the Nike project based on a sincere determination that it violated the ordinance.

Murphey first learned about the Nike project on the morning of February 12, 2020, only two days before the anticipated display. *See* Def.'s Statement of Undisputed Facts, at ¶ 11 (Dckt. No. 131); Pl.'s Statement of Undisputed Facts, at ¶ 39 (Dckt. No. 134). Only three hours after reviewing the proposed projections, Murphey informed Ann Hickey of DCASE that the "projection is not permitted under zoning temporary special events signage rules." *See* Def.'s Statement of Undisputed Facts, at ¶ 13 (Dckt. No. 131); Pl.'s Statement of Undisputed Facts, at ¶ 40 (Dckt. No. 134).

Murphey emailed Micah Lane and cited the ordinance about temporary signs. He pointed to the provision stating that "[t]emporary signs may not be illuminated," and that "[d]ynamic image display sign features" are prohibited. *See* Def.'s Statement of Undisputed Facts, at ¶ 13 (Dckt. No. 131); Pl.'s Statement of Undisputed Facts, at ¶ 40 (Dckt. No. 134).

National Experiential tried to convince Murphey that the projection fell under the exemption for "art with no commercial message." Based on the record, Murphey considered the argument, but he decided that the Jumpman logo was inextricably tied to the Nike brand.

Murphey noted that "if the word 'UNITE' includes the Nike Jordan Jumpman symbol in place of the 'I,' then that is as much a marketing message as printing Nike, Coke or Pepsi on the side of the building." *See* Def.'s Statement of Undisputed Facts, at ¶ 16 (Dckt. No. 131).

Early the next morning, Murphey wrote to the attorneys for National Experiential. Once again, he pointed to the language of the ordinance. He noted that the display would not be "permitted as an illuminated changing image sign" if the "projection has a commercial message." *See* Def.'s Statement of Undisputed Facts, at ¶ 18 (Dckt. No. 131).

It's hard to argue with the notion that Nike's display carried a commercial message. After all, the display prominently featured the Jumpman logo. The Jumpman logo has got to be one of the most valuable, recognizable, and beloved trademarks in the world. That logo has enormous commercial value, and Nike isn't shy about using it to hawk mass quantities of shoes, clothes, and other gear.

The use of that logo went hand-in-hand with the projection of Michael Jordan jumping from the free throw line and dunking the ball. The Jumpman logo features Jordan himself, and Jordan has collaborated with Nike for decades. The association is as close as they come.

Looking at Jordan sail through the air makes you wonder if It's Gotta Be the Shoes. And Nike sells the shoes.

Nike's display conveyed an unmistakable message: if you're thinking about buying our stuff, Just Do It. The commercial nature of the speech is inescapable.

National Experiential needs to look no further than its own contract with Nike to see that the projections were commercial in nature. The contract repeatedly referred to the projections as "advertisements." *See* Contract, Pl.'s Ex. 3 (Dckt. No. 134-3) (using variations of the word "advertisement" over ten times). What's more, the former North America Director of Government and Public Affairs at Nike (Jeanette Rodriguez) admitted that "the Jumpman logo" was a "commercial proposition." *See* Rodriguez Dep. Tr., at 67:16 – 68:3 (Dckt. No. 134-42). The logo might be art, but it certainly isn't art "with no commercial message."

Nothing in the record supports the notion that Murphey disfavored Nike or the Jordan brand. There isn't any evidence that he supported a rival shoe company, or rooted for the New York Knicks. He didn't oppose the sale of athletic apparel, or favor some other type of commercial speech (like ads for iPhones).

There isn't any evidence that he supported the Chicago Bulls over Nike, either. And there isn't any evidence that he wanted the CSC to speak, and wanted Nike to stay silent.

Simply put, nothing in the record suggests that Murphey pulled the plug because he disfavored Nike or any message that Nike wanted to present. Instead, the record confirms that Murphey did not approve the display because it violated the ordinance.

The parties spill a lot of ink arguing about whether the Jumpman logo contains a commercial message. That question seems like a slam dunk. But it's also beside the point.

For First Amendment purposes, the question is not whether a municipality applied an ordinance *correctly*. The question is whether a municipality applied an ordinance *constitutionally*. *See Grand Chute*, 915 F.3d at 1126 (noting that whether an officer's determination that a sign violated an ordinance "was correct . . . does not matter" for purposes of viewpoint discrimination).

Sometimes municipalities have to make judgment calls about whether a sign or a display violates an ordinance. Some judgment calls are jump balls, and can go either way. Making mistakes does not, without more, establish viewpoint discrimination. *See HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cnty. of Marion*, 889 F.3d 432, 440 (7th Cir. 2018) ("[A]n erroneous application of a zoning ordinance is unlikely to be a First Amendment violation.").

Federal courts "'are not zoning boards of appeal.'" *Id.* (citing *CEnergy-Glenmore Wind Farm No. 1, LLC v. Town of Glenmore*, 769 F.3d 485, 487 (7th Cir. 2014)). State law "provides

judicial review for zoning decisions that are challenged as arbitrary, capricious, or unsupported by the evidence." *Id.* In fact, "the Supreme Court has found ordinary state court civil procedures sufficient to protect any First Amendment interests in erroneous zoning determinations." *Id.* (citing *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 782 (2004)).

For that reason, National Experiential can't score any points by relying on its expert. The expert believes that the display was a "work of art" because it used the Jumpman logo to "replace the letter I in the word Unite." *See* Rappoport Dep. Tr., at 43:15-17 (Dckt. No. 134-5). That opinion addresses whether the City got it wrong. But the City didn't have to be right. It simply had to be neutral.

National Experiential doesn't believe the explanation for rejecting the Nike display. It cries foul because the skyscrapers didn't go dark during All-Star Weekend.

Instead, the Prudential Building was lit up in red, the color associated with the Chicago Bulls. So, in effect, the CSC got what it wanted after all. (As an aside, the Blue Cross building displayed a sign reading, "NBA All-Star 2020." But that building wasn't covered by the National Experiential contract.)

One can only imagine how National Experiential felt after learning that it couldn't display the Nike ad. As bad as it must have felt, National Experiential must have felt worse when it looked up and saw a *different* display in the same spot.

It is understandable why National Experiential wonders why the other displays passed muster, but the Nike display didn't. After all, a sign reading "NBA All-Star 2020" is commercial speech, too. The NBA is a multi-billion-dollar organization, with a vast commercial empire.

Then again, it is unclear from the record whether that display on the Blue Cross building fell within the scope of the ordinance. By the look of things, the Blue Cross building may have created that message simply by turning certain lights on, and using window shades. So maybe it wasn't a "sign" within the meaning of the regulation. *See* MCC § 17-12-0804-A; MCC § 17-17-02159 (defining "sign" as "[m]aterials placed or constructed, or light projected, that (1) conveys a message or image and (2) is used to inform or attract the attention of the public").

It is a harder call whether displaying the color red on the Prudential Building conveyed a commercial message. One wonders if the color red, without more, "conveys a message." *See* MCC § 17-17-02159. At the very least, the meaning might have not jumped out at passersby. After all, it was Valentine's Day, so maybe the color wasn't associated with the Bulls. Even so, it is understandable why National Experiential would have its doubts.

So, the message on the Blue Cross building conveyed a commercial message, but it may not have been a "sign." On the flipside, the display on the Prudential building may or may not have been a "sign." It involved "light" that was "projected." But maybe there is room for debate about whether it "convey[ed] a message or image."

National Experiential had suspicions, and came up with a theory. But after discovery, National Experiential doesn't have enough evidence to support it.

The record does not include evidence that the City favored the Chicago Bulls and the NBA over Nike. And the record lacks evidence that the City favored the CSC over Nike, too.

In fact, the record lacks evidence that the City even knew about the CSC's display before it happened. The CSC didn't have a permit. And the CSC didn't *apply* for a permit, either. *See* Pl.'s Statement of Undisputed Facts, at ¶ 63 (Dckt. No. 134); *see also* Murphey Affidavit, Def.'s Ex. 20 (Dckt. No. 131-20).

By the look of things, the CSC went ahead and projected what it wanted to project, without getting the blessing of the City itself. Murphey testified that he did not recall knowing about the CSC's plans in February 2020. *See* Murphey Dep. Tr., Vol 1, at 117:21, 118:4 (Dckt. No. 134); *see also* Murphey Affidavit, Def.'s Ex. 20 (Dckt. No. 131-20). The CSC apparently went rogue, and rode roughshod over the Municipal Code.

Murphey explained that enforcing temporary sign provisions in a consistent manner across the board is difficult because the signs are just that: *temporary*. "Often by the time the City learns about such a display or projection, it is already over." *See* Murphey Affidavit, Def.'s Ex. 20 (Dckt. No. 131-20).

National Experiential believes that the CSC and the City were in cahoots. It points to the fact that, as early as December 2019, the CSC asked the Prudential Building to light itself red to promote the Chicago Bulls. And Kara Bachman – the executive director of the CSC – sent an email celebrating the demise of the Nike display only 10 minutes after Murphey made his decision. *See* 2/14/20 Bachman Email, Pl.'s Ex. 39 (Dckt. No. 134-40) ("You do not have approval to project. It's simple. NOT APPROVED.").

Maybe that's the corporate equivalent of unsportsmanlike conduct. But it's not enough to get to a jury. The CSC got what it wanted, but that's not enough to show viewpoint discrimination.

The outcome would be different if National Experiential had gathered evidence showing that the City disapproved the Nike display because of its message. And the case would go to trial if the City showed favoritism to one speaker over another. The City can't pick winners and losers when it comes to speech.

But it isn't enough to show that one speaker said what it wanted to say, and another speaker didn't. A viewpoint discrimination claim requires evidence that the government favored one speaker over another based on the speech itself. And on this record, a reasonable jury could not make that finding. The record does not contain enough evidence that the City gave its blessing to the CSC, and pulled the rug out from under National Experiential, because it preferred one speaker over another.

Tying it all up, National Experiential has not come forward with sufficient evidence of viewpoint discrimination, even though the Prudential Building was lit up in red. That's true, for several reasons.

First, the City did not approve lighting the Prudential Building. Second, even if it did, the City could have had a legitimate basis to treat them differently under the ordinance (*e.g.*, maybe the red lights on the Prudential Building weren't a "sign," or didn't convey a commercial message). Third, a potential inconsistency, without more, is not enough to establish viewpoint discrimination. Fourth, and most importantly, there is no evidence that the City favored the CSC and disfavored Nike and National Experiential based on the message or the speaker. The government didn't put its thumb on the scale in the City of Broad Shoulders.

National Experiential offers one other point of comparison. It points to the annual "Art on the MART" exhibition at the Merchandise Mart.

The Merchandise Mart is a large, privately owned commercial building located on the riverfront in downtown Chicago. *See About*, The Mart, https://www.themart.com/about/ (last visited September 1, 2026). Built in the 1930s in an Art Deco style, the Merchandise Mart is a fixture of downtown Chicago. *Id.*

From April through December each year, the Merchandise Mart plays host to a nightly event, "Art on the MART." *See About*, Art on the Mart, https://artonthemart.com/about (last visited September 1, 2026). "A shining example of Chicago's long-standing commitment to public art, Art on the MART brings cutting-edge video mapping techniques to Chicago's Riverwalk, displaying projections of contemporary art across the 2.5-acre façade of the MART." *Id.*

National Experiential argues that if the City "routinely allows illuminated projection on the Merchandise Mart," then it should have allowed National Experiential's projections, too. *See* Am. Cplt., at ¶ 69 (Dckt. No. 72).

That's not much of a comparison. As the name suggests, "Art on the MART" displays art, not commercial speech. The Nike ad featured a commercial logo, but "Art on the MART" does not. The City did not apply the ordinance in a discriminatory way. Nike's advertisement fell within the ordinance, and the exhibits at the Merchandise Mart do not.

The difference couldn't be more material. The Jumpman logo is the reason the City blocked the projection. Plaintiff itself explains that, after learning of the zoning issue, representatives of National Experiential discussed "the possibility of removing the Jumpman logo (*based on discussions with City representatives where they identified the commercial mark as the root of the problem*)." *See* Pl.'s Statement of Undisputed Facts, at ¶ 46 (Dckt. No. 134) (emphasis added).

It is not as if the City allows commercial speech on the Merchandise Mart, but doesn't allow it by Millennium Park. The City did not pick winners and losers when it came to the message, either.

The speakers were not "similarly situated." *See Perry*, 460 U.S. at 55. And there is no evidence that the City "favor[s] one speaker over another." *See Rosenberger*, 515 U.S. at 828. So Art on the MART doesn't create a genuine issue of material fact.

At the beginning stages of this case, this Court foresaw that National Experiential's viewpoint discrimination claims would boil down to a simple question: why did the City do what it did? *See* 8/9/24 Order, at 31 (Dckt. No. 95). After discovery, there is no longer any mystery. The City did what it did because it enforced a valid, viewpoint-neutral ordinance.

The record lacks sufficient evidence that the City engaged in viewpoint discrimination. The Court grants summary judgment for the City on Count III.

## III. Excessive Discretion (Count IV)

The last claim is about the amount of discretion that the Municipal Code vests in the Zoning Administrator.

Section 17-12-0804-E authorizes the Zoning Administrator to issue permits for temporary signs. "The Zoning Administrator is authorized to issue temporary sign permits for special event signs and to impose time limits and other restrictions on the use, location, dimensions and characteristics of such signs to ensure that they are consistent with the purposes of this chapter."

National Experiential challenged that provision in its amended complaint. The company alleged that "0804-E creates several subjective criteria" that the Zoning Administrator uses as "pretext" to regulate protected speech. *See* Am. Cplt., at ¶¶ 15, 16 (Dckt. No. 72).

National Experiential went in a different direction in its summary judgment brief. The company now challenges an entirely *different* provision of the Code. National Experiential challenges section 17-12-0504, which exempts "works of art with no commercial message." As

the company sees things, the Municipal Code doesn't sufficiently define what qualifies for this exemption.

National Experiential doesn't deny the change in course. It downplays the switch, explaining that "since this matter has progressed beyond the pleading stage and through discovery, Plaintiff's excessive discretion claims concentrate elsewhere." *See* Pl.'s Resp. to Def.'s Mtn. for Summary J., at 14 (Dckt. No. 141).

The City calls out this late-in-the-game substitution for what it is – a bait and switch – and argues that the Court should not permit it. The Court agrees.

"A plaintiff cannot amend its complaint through briefing." *See Neurodegenerative Disease Rsch., Inc. v. Nw. Univ.*, 2025 WL 3171287, at *6 (N.D. Ill. 2025). And while a district court "retain[s] discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend," the Seventh Circuit has cautioned that "it will rarely be appropriate to do so." *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023). At the summary judgment stage, it is far "too late . . . to add a new claim beyond the scope of the complaint." *Id.* at 486.

The Court declines to consider the new legal theory. National Experiential cannot take a shot after the buzzer sounds and expect the Court to count it. The time for amendment has long passed. This litigation has been ongoing since 2021. National Experiential had ample opportunity to bring this claim before now. Instead, the company raised the point for the very first time in its summary judgment brief.

"Defendants are entitled to fair notice of each claim against them." *Schmees*, 77 F.4th at 488. A party cannot adequately defend itself against a claim it does not know exists. The City moved for summary judgment on the claims pleaded in the amended complaint, *not* on the new

claim that emerged at the summary judgment stage. Permitting National Experiential to radically reshape its claim at this late hour would deprive the City of fair notice.

In any event, National Experiential's excessive discretion argument has no merit. "Where [a] licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002). To guard against that risk, regulations must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id*. "Standards are adequate if they are 'narrow, objective, and definite.'" *See GEFT Outdoor, LLC v. Monroe Cnty.*, 62 F.4th 321, 326 (7th Cir. 2023) (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)).

The Municipal Code provides those standards. The Zoning Administrator does not exercise unfettered discretion to decide whether a particular display constitutes "art." Rather, the Department of Planning and Development applies the Code's objective definition of "commercial message" to determine whether a display qualifies as "art *with no commercial message*." *See* Murphey Dep. Tr., Vol. I, at 44:4-7 (Dckt. No. 134-26); Murphey Dep. Tr., Vol. II, at 165:1-6.

The Code defines a "commercial message" as "any sign, wording, or logo that directly advertises a specific business, proprietary product or service, or other commercial activity." *See* MCC § 17-17-0236. Another provision of the Code further defines "sign" as "[m]aterials placed or constructed, or light projected, that (1) conveys a message or image and (2) is used to inform or attract the attention of the public." *See* MCC § 17-17-02159.

Murphey applied those criteria when blocking the Jumpman projection. He determined that the projection was a "sign" because it projected light that conveyed an image and was used

to attract the public's attention. He further determined that it contained a "commercial message" because the Jumpman logo directly advertised Nike, a specific business. Nothing about that analysis required Murphey to make a purely subjective judgment.

National Experiential's new theory comes too late in the game, and it misses the mark. So the Court grants summary judgment for the City on Count IV.

**Conclusion**

For the reasons stated above, the City's motion for summary judgment is granted in full. National Experiential's motion for summary judgment is denied. The City's motion to exclude expert testimony is denied as moot.

Date: September 30, 2026

Steven C. Seeger
United States District Judge